739 So.2d 748 (1999)
CITY OF NEW ORLEANS and the Vieux Carré Commission
v.
BOARD OF DIRECTORS OF the LOUSIANA STATE MUSEUM, James Sefcik; Tammany Contracting Company; and The Department of Culture, Recreation and Tourism.
No. 98-C-1170.
Supreme Court of Louisiana.
March 2, 1999.
*749 Richard P. Ieyoub, Atty. Gen., David A. Dalia, New Orleans, Gary L. Keyser, Baton Rouge, Counsel for Applicant.
Harry E. Cantrell, Jr., New Orleans, Avis M. Russell, City Atty., Counsel for Respondent.
Anthony C. Marino, New Orleans, Counsel for amicus curiae Vieux Carre Property Ass'n.
James R. Logan, IV, New Orleans, Counsel for amicus curiae Louisiana Landmarks Society.
Lloyd N. Shields, Daniel Lund, III, Michelle L. Corrigan, New Orleans, Counsel for amicus curiae Preservation Alliance of New Orleans and Preservation Resource Center.
KNOLL, Justice.[*]
The controversy before us concerns a dispute between the Vieux Carré Commission (hereinafter "VCC") and the Louisiana State Museum (hereinafter "LSM") as to whether the VCC can enjoin the LSM from installing a fence to enclose the arcade of the Cabildo in the French Quarter *750 of New Orleans.[1] The trial court granted the LSM's exception of no cause of action and dismissed the VCC's temporary restraining order and petition for injunction. On appeal, the Fourth Circuit reversed and remanded the case, holding both that the VCC had jurisdiction over state-owned buildings within the Vieux Carré and that requiring the State to comply with the VCC's permit procedure did not abridge the State's police power. We granted this writ to further study the correctness vel non of the court of appeal's judgment.[2] We now vacate and set aside the court of appeal's judgment and reinstate the trial court's judgment concluding that the VCC's actions and denial of the permit for an architecturally and historically accurate fence to protect the Cabildo were unreasonable, arbitrary, and capricious, and thereby abridged the police power of the State.[3]

FACTS
The LSM, originally known as the Board of Curators, was created in 1906 when the State decided to house the exhibits it had sent to the Louisiana Purchase Exposition in St. Louis. In 1908, the City of New Orleans transferred the Cabildo to the Board of Curators in perpetuity for museum purposes.[4] The Cabildo is one of Louisiana's most historic buildings. Built in 1795 as the seat of the Spanish governing body in New Orleans, the Cabildo was the site of the signing of the Louisiana Purchase Transfers of 1803. Further, in the late nineteenth century, the Cabildo served as both the situs for the New Orleans City Hall and the home of the first Louisiana Supreme Court.
The City of New Orleans established the first Vieux Carré Commission in 1925. By municipal ordinance, the City created the Commission to preserve those structures of special historic interest whose old, quaint, and unusual architectural construction made them objects of special interest. However, this Commission lacked any statutory authority to effectuate preservation of these structures in the Vieux Carré. Recognizing this impairment and the historical and architectural importance of the Vieux Carré, the citizens of this State on November 3, 1936, amended Article XIV, § 22(A) of the Louisiana Constitution of 1921 and authorized the New Orleans City Council to create the current VCC.
Amended Article XIV, § 22(A) was divided into six entitled sections: creation and membership, purpose, definition of boundaries, tax exemption for certain buildings, acquisition of buildings, and duties of the commission. The amendment provided in pertinent part:
Section 22A. Creation; membership. The Commission Council of the City of New Orleans is hereby authorized to create and organize a Commission to be known as the Vieux Carré Commission, to be appointed by the Mayor of said City with the advice and consent of its Commission Council and to be composed of nine members, all of whom shall be citizens of the City of New Orleans....
. . . .
Purpose. The said Commission shall have for its purpose the preservation of *751 such buildings in the Vieux Carré section of the City of New Orleans as, in the opinion of said Commission, shall be deemed to have architectural and historical value, and which buildings should be preserved for the benefit of the people of the City of New Orleans and the State of Louisiana, and to that end the Commission shall be given such powers and duties as the Commission council of the City of New Orleans shall deem fit and necessary.
Vieux Carré Section defined. The Vieux Carré section of the City of New Orleans is hereby defined to comprise all that area within the City Limits of the City of New Orleans contained within the following boundaries: The River, Uptown side of Esplanade Avenue, the River side of Rampart Street, and the lower side of Iberville Street.
Buildings; tax exemption; preservation.....
Buildings; acquisition. The preservation of the buildings in the Vieux Carré section of New Orleans having architectural and historical value is hereby declared to be a public purpose....
Duties of commission. Hereafter and for the public welfare and in order that the quaint and distinctive character of the Vieux Carré section of the City of New Orleans may not be injuriously affected, and in order that the value to the community of those buildings having architectural and historical worth may not be impaired, and in order that a reasonable degree of control may be exercised over the architecture of private and semi-public buildings erected on or abutting the public streets of said Vieux Carré section, whenever any application is made for a permit for the erection of any new building or whenever any application is made for a permit for alterations or additions to any existing building, any portion of which is to front on any public street in the Vieux Carré section, the plans therefor, so far as they relate to the appearance, color, texture of materials and architectural design of the exterior thereof shall be submitted by the owner to the Vieux Carré Commission and the said Commission shall report promptly to the Commission Council its recommendations, including such changes, if any, as in its judgment are necessary, and the said Commission Council shall take such action as shall, in its judgment, effect reasonable compliance with such recommendation, or to prevent any violation thereof.
The Commission Council of the City of New Orleans may, by ordinance or otherwise, carry the above and foregoing provisions into effect.
LA.CONST. art. XIV, § 22(A) (1921) (emphasis added). The Louisiana Constitution of 1974 retained the authority for the VCC in Article VI, § 17.[5] Accordingly, the specific provisions of section 22(A) are retained as constitutional authority. Acting pursuant to this enabling amendment, the City of New Orleans on March 3, 1937, created the VCC by Ordinance No. 14,538.[6] *752 See NEW ORLEANS, LA., COMMISSION COUNCIL SERIES No. 14,538 (1937). The City of New Orleans has amended the ordinance's provisions several times; however, it has consistently retained its substance.[7]
The LSM is responsible for the maintenance and preservation of eight historic buildings in New Orleans: the Cabildo, the Presbytére, the Jackson House, the Creole House, the Arsenal, Madame John's Legacy, the Old U.S. Mint, the Lower Pontalba Buildings, and the W.R. Irby Trust. In 1988, fire severely damaged the Cabildo, requiring the demolition and renovation of its third floor. Immediately after this incident, the LSM began experiencing problems with vandalism at the Cabildo. On a daily basis, the Cabildo personnel were required to clean, sweep, and hose under the arcade to remove urine, excrement, vomit, and other matter deposited nightly by trespassers. Moreover, vagrants regularly frequented the Cabildo's arcade, using it as a flophouse and littering the area with cans, broken bottles, cardboard, newspapers, and other debris. The LSM became concerned about the safety of the Cabildo, its appearance, its contents, its staff, and its visitors. It often became necessary to call the New Orleans Police Department to remove individuals who were either intoxicated, belligerent, or threatening. Interestingly enough, the early history of the Cabildo reflects the same concerns and need for a protective fence that are present today. On February 25, 1809, the New Orleans City Council requested that the mayor place a fence at the Cabildo to prevent "unclean acts from being committed." (R. at 83-85, 89).
Restoration of the fire-damaged Cabildo began in 1991, at which time an architecturally and historically accurate, protective fence was considered to enclose the arcade of the Cabildo to prevent further desecration of the building. However, the fence was not installed due to a lack of funding. At the time, the Cabildo was the only building on the Chartres Street mall lacking a protective fence.[8]
By 1995, the LSM obtained funding to install a fence to enclose the arcade of the Cabildo. That same year, the LSM notified the VCC by "courtesy" letter of the safety and security problems at the Cabildo and of LSM's intent to erect an architecturally and historically correct iron fence similar to the one protecting the Presbytére's arcade. Appended to this letter was a complete description of the details of the work to be performed, with an explanation of all requirements for historical authenticity and appearance. To ensure historical accuracy, Mr. Sefcik, the Director of the LSM, requested that the State's Office of Facility Planning & Control Department of the Division of Administration staff insure that the Cabildo's fence be identical to the Presbytére's fence in design, size, color, and appearance. The LSM wanted to replicate the fence at the Presbytére because it dated back more than 150 years and because it prevented the same dangers and problems from occurring at the Presbytére that it was experiencing at the Cabildo.[9] In June of 1995, *753 the VCC staff asserted that if a fence was placed at the Cabildo, then it should be hand forged and an exact replica of the Presbytére fence. Based in part on the VCC's assertion, Mr. Sefcik contacted Marc Cooper, Director of the VCC, on several occasions concerning the fence design. Mr. Cooper recommended David Mudge as the expert to design the technical specifications for the materials and details of the fence for the LSM. Based solely on the VCC's recommendation, LSM contracted with Mr. Mudge.
Subsequently, Mr. Mudge measured the proposed site of the fence and consulted with the LSM. The LSM specifically informed him of the importance that the fence be hand forged and match precisely the one at the Presbytére. In November of 1995, the information and specifications developed by Mr. Mudge were forwarded to the Office of Facility Planning & Control Department of the Division of Administration for inclusion into the official bid project. Mr. Sefcik again informed the VCC, through Mr. Cooper, that the project was going forward. The LSM successfully bid the project in April of 1996. LSM awarded the contract to Tammany Contracting, Inc., again emphasizing that the fence must be hand forged and a precise match of the Presbytére fence. An exemplary section of the iron fence was completed and submitted to the LSM. The VCC participated in the inspection and approval of the exemplary section of the fence before fabrication of the remainder. It is undisputed that the fence is an exact replica of the fence in place at the Presbytére as to material, method and fabrication technique, and paint finish.
Only when fabrication of the fence was completed did the VCC, for the first time, assert that the LSM was required to seek and be issued a permit for the project from it. The VCC met on April 15, 1997, and voted (5-2, 1 recusal) to require the VCC staff to issue a stop-work order on any work done in the French Quarter without a valid VCC permit. Before this, the VCC had never requested that the LSM seek permits from the VCC for any constructions, alterations, additions, painting or any other work on LSM buildings;[10] however, many contractors hired by the LSM had previously applied for and received permits, following the principle of comity suggested by Attorney General's Opinion No. 76-60.[11]
Following this practice of comity, on May, 5, 1997, Tammany Contracting, Inc. applied to the VCC for a permit to construct the fence. Although the fence was architecturally and historically accurate in all aspects, on May 13, 1997, the VCC's Architectural Committee, for reasons unknown, voted unanimously to recommend denial of the permit. Furthermore, on May 20, 1997, the VCC voted to postpone any reconsideration of its decision to allow legal counsel to seek a judicial determination. The LSM sought and received an Attorney General's opinion on this matter. The opinion concluded that the amendment to the 1921 Constitution did not grant the VCC jurisdiction over state-owned buildings because the express provisions of the amendment limited its jurisdiction to private and semi-public buildings. Although this matter was placed on the VCC's agenda for a public vote on at least two occasions in May and June of 1997, the VCC *754 declined to consider the matter. During oral arguments, it was brought to our attention that the VCC knowingly ensured that no vote could be taken on this matter during the May and June open sessions by having members of the commission intentionally leave the room when the matter came up for a vote, thus preventing a quorum. By preventing a quorum, the VCC could table any discussion or vote on the matter. The VCC failed to act on this matter in open session until August 19, 1997, two months after it initiated suit, wherein it voted to deny the permit for reasons unknown.
After the Attorney General's opinion had been rendered, Mr. Sefcik advised Mr. Cooper in a telephone conversation on June 1, 1997, that the LSM intended to complete the project.[12] That same day, LSM's Chairman, Dr. Ralph Lupin, telephoned Mr. Cooper to advise him that a letter would arrive in a day or so stating LSM's intent to install the fence in two weeks time. However, the project began on June 4, 1997. That same day, as the first phase of the installation commenced, Mr. Cooper issued and delivered a stopwork order to Tammany Contracting, Inc.

PROCEDURAL HISTORY
On June 5, 1997, the VCC and the City of New Orleans initiated this action by filing a petition for injunctive relief and an application for a temporary restraining order, which the trial court granted. The LSM filed a peremptory exception of no cause of action, claiming that the LSM was not subject to the VCC's jurisdiction. On June 13, 1997, the trial court held a hearing on both issues. The trial court granted the LSM's exception of no cause of action, denied the VCC's preliminary injunction, and dismissed the VCC's temporary restraining order and petition for injunction on June 17, 1997.
On that same day, the VCC applied for a suspensive appeal and a stay order directing the LSM to take no action on constructing the fence pending the appeal. The trial court granted the suspensive appeal, but denied the stay order. Thereafter, the VCC applied to the Fourth Circuit Court of Appeal for a restraining order pending its decision. The Fourth Circuit denied the writ, noting that the relators had an adequate remedy on appeal. As the court stated: "In the unlikely event that the respondent goes to the expense of putting up a fence that respondent might later be ordered to remove, it will then be removed. There is no risk of permanent and irreparable injury."
Due to the continuing risk to the Cabildo, its contents, its staff, and its visitors, and due to the misconduct in the Cabildo arcade at night,[13] the LSM proceeded with installation of the historically accurate fence on July 8, 1997. Upon excavation of sixty-six five-inch deep holes into eleven arches of the Cabildo arcade, the VCC filed a motion with this Court for a restraining order. This Court, however, denied the application, with Chief Justice Calogero noting that unless distinguished, *755 this matter may be controlled by Board of Comm'rs of the Orleans Levee Dist., 640 So.2d at 237. See City of New Orleans v. Board of Dirs. of the La. State Museum, 97-1817 (La.7/10/97), 696 So.2d 1020. Subsequently, the fence was completed at the Cabildo and is an architectural and historical replica of the fence at the Presbytére. On August 1, 1997, the LSM moved to dismiss the suspensive appeal, which was denied on August 14, 1997.
On appeal, the Fourth Circuit reversed and remanded the case, holding both that the VCC had jurisdiction over state-owned buildings within the Vieux Carré and that requiring the State to comply with the VCC's permit procedure did not abridge the State's police power. The court found that the single reference to "private and semi-public," read in context of the whole amendment, was meant specifically to include private and semi-public buildings, not tacitly to exclude public buildings. The court recognized that the State has a vital interest in the Cabildo, quite possibly the most architecturally and historically important structure in Louisiana, but determined that the protection of this interest and the VCC's ordinances were compatible. Thus, the court reasoned that no conflict existed because the LSM and VCC have distinct powers and duties regarding the Cabildo. For the following reasons, we find the court of appeal's rationale untenable, as it reads into the Constitution words that are clearly not there and renders words in the Constitution meaningless. We conclude that the VCC's actions and the denial of the permit for an architecturally and historically accurate fence to protect the Cabildo were unreasonable, arbitrary, and capricious, resulting in an impermissible interference with and abridgement of the police power of the State.

LAW AND ANALYSIS
The preservation of the Vieux Carré, an ancient vestige of Louisiana's historical past, is not an interest limited to the City of New Orleans. This interest transcends such local boundaries. It is an interest of statewide concern because our Constitution declares that the preservation of the buildings in the Vieux Carré is a public purpose "for the benefit of the people of the City of New Orleans and the State of Louisiana." LA.CONST. art. XIV, § 22(A). Further, preservation of the Vieux Carré is important not only for its sentimental and esthetic value, but also for its commercial value to the State as a whole. However, the trust imposed upon the City and the VCC by our Constitution cannot be discharged outside the limitations expressed therein. LA. CONST. art. VI, § 4; Board of Comm'rs of Orleans Levee Dist., 640 So.2d at 243-44. They must discharge this trust with the interest of the whole State and not just the City in mind. As long as the City and the VCC undertake to discharge this interest, they must do so with reasonable diligence and prudence and within the dictates expressed in our Constitution. As this Court has recognized before, if the City and the VCC undertake the discharge of this interest, the discharge of the duties expressed in the constitutional amendment is not discretionary it is mandatory. Vieux Carré Prop. Owners & Assocs., Inc. v. City of New Orleans, 246 La. 788, 167 So.2d 367, 374 n. 4 (1964).
The purpose of the peremptory exception of no cause of action is to determine the sufficiency in law of the petition. The burden of showing that the plaintiff has stated no cause of action is upon the exceptor. The public policy behind the burden is to afford the party his day in court to present his evidence. Jarrell v. Carter, 577 So.2d 120 (La.App. 1 Cir.), writ denied, 582 So.2d 1311 (La.1991). The exception is triable on the face of the papers, and for the purpose of determining the issues raised by the exception, the court must presume that all well-pleaded facts in the petition are true. All reasonable inferences are made in favor of the nonmoving party in determining whether the law affords any remedy to the plaintiff. *756 LA.CODE CIV.P. arts. 927, 931; Mayer v. Valentine Sugars, Inc., 444 So.2d 618 (La. 1984). A court of appeal reviews de novo a lower court's ruling sustaining an exception of no cause of action because the exception raises a question of law and because the lower court's decision is generally based only on the sufficiency of the petition. Mott v. River Parish Maintenance, Inc., 432 So.2d 827 (La.1983). The question is whether, in the light most favorable to the plaintiff, the petition states any valid cause of action for relief. Jarrell, 577 So.2d at 120.
Generally, under LA.CODE CIV.P. art. 931 parties may introduce no evidence to support or controvert the exception. See, e.g., Treasure Chest Casino, L.L.C. v. Parish of Jefferson, 96-1010 (La.App. 1 Cir. 3/27/97), 691 So.2d 751, 754, writ denied, 97-1066 (La.6/13/97), 695 So.2d 982. However, the jurisprudence recognizes an exception to this rule that allows the court to consider evidence admitted without an objection to enlarge the pleadings. Treasure Chest Casino, 691 So.2d at 754; Woodland Rigde Ass'n v. Cangelosi, 94-2604 (La.App. 1 Cir. 10/6/95), 671 So.2d 508; City Nat'l Bank of Baton Rouge v. Brown, 599 So.2d 787, 789 (La.App. 1 Cir.), writ denied, 604 So.2d 999 (La. 1992). Here, the trial court ordered that all evidence, affidavits, or exhibits in support be submitted seventy-two hours before the June 13, 1997, hearing on both the VCC's injunction action and the LSM's peremptory exception. While the LSM filed into the record several attachments and affidavits, the VCC filed no additional evidence into the record on the matters. Thus, the VCC was afforded its day in court to present its evidence in support of the injunction proceedings. Accordingly, a determination by this Court of whether the plaintiff may maintain a cause of action against the LSM may be made by a review of all the facts supported by the record.
An exception of no cause of action is likely to be granted only in the unusual case in which the plaintiff includes allegations that show on the face of the petition that there is some insurmountable bar to relief. Thus, dismissal is justified only when the allegations of the petition itself clearly show that the plaintiff does not have a cause of action, or when its allegations show the existence of an affirmative defense that appears clearly on the face of the pleadings. Board of Comm'rs of Orleans Levee Dist., 640 So.2d at 237. A court appropriately sustains the peremptory exception of no cause of action only when, conceding the correctness of the well-pleaded facts, the plaintiff has not stated a claim for which he can receive legal remedy under the applicable substantive law.
Applying the above facts to the constitutional and legal precepts to this case, we conclude that the VCC cannot maintain a valid cause of action for a mandatory injunction against the LSM. Because the fence was erected between the columns of the Cabildo's arcade, only the VCC's mandatory injunction is at issue. Specifically, the VCC seeks an order directing the LSM to remove all vestiges of the constructed fence and to restore the Cabildo to its original condition. (VCC's Petition for Temporary Restraining Order and Injunction ¶ 19, at R. at 1). A mandatory injunction commands a party to take specific action. Maynard Batture Venture v. Parish of Jefferson, 96-649 (La.App. 5 Cir. 12/30/96), 694 So.2d 391, 393; Maestri v. Destrehan Veterinary Hosp. Inc., 554 So.2d 805 (La.App. 5 Cir.1989); Walker v. Investment Properties, Ltd., 483 So.2d 1131 (La.App. 5 Cir.1986). A mandatory injunction may not be issued on a merely prima facie showing that the party seeking the injunction can prove the necessary elements; instead, the party must show by a preponderance of the evidence at an evidentiary hearing that he is entitled to the preliminary injunction. Denta-Max v. Maxicare La., Inc., 95-2128 (La.App. 4 Cir. 3/14/96), 671 So.2d 995. Thus, the issue is whether the VCC has stated a *757 claim for a mandatory injunction to remove the Cabildo's fence under the applicable law.
The LSM, in erecting the fence between the arches of the Cabildo's arcade to preserve, maintain, and protect the architectural and historical worth of the Cabildo, its contents, its staff, and its visitors against vandalism and the daily dangers caused by loiters, was reasonably exercising a core state function. While the police power of the state is generally definable only by the facts and circumstances on a case by case basis, it has, nonetheless, been described as the state's inherent power to govern persons and things, within constitutional limits, for the promotion of general health, safety, welfare, and morals. See., e.g., Francis v. Morial, 455 So.2d 1168, 1173 (La.1984); Fernandez v. Alford, 203 La. 111, 13 So.2d 483, 489. The police power extends, however, only to such measures as are reasonable. Francis, 455 So.2d at 1173; Schwegmann Bros. v. Louisiana Bd. of Alcoholic Beverage Control, 216 La. 148, 43 So.2d 248, 255 (1949). In order for a measure taken under the state's police power to be reasonable, the action taken must be, under all the circumstances, reasonably necessary and designed to accomplish a purpose properly falling within the scope of the police power. Id. Accordingly, to sustain an action under the police power, the court must be able to see that its operation tends in some degree to prevent an offense or evil or otherwise to preserve public health, safety, welfare or morals. Francis, 455 So.2d at 1173.
As the court of appeal correctly recognized, this Court in Board of Comm'rs of Orleans Levee Dist., expressly enunciated the critical distinction between pre-1974 home rule entities and post-1974 home rule entities. Preexisting home rule entities' powers include the power to initiate legislation within their boundaries not inconsistent with the 1974 Constitution and the power of immunity for the State's authority to reverse, withdraw, preempt, or deny such legislation. 640 So.2d at 244-46. Post-1974 home rule entities are limited to the exercise of their home rule powers in conformity with the 1974 Constitution and general State law. Id.
In addition, this Court has recognized that under Article VI, § 9(B) of the 1974 Constitution, one limitation on the powers of home rule entities is that they shall never abridge the police power of the State. City of Baton Rouge v. Williams, 95-0308 (La.10/16/95), 661 So.2d 445. The LSM argues that under Board of Comm'rs of Orleans Levee Dist., the VCC is impermissibly infringing upon "that residuum of police power" reserved to the State. 640 So.2d at 251. Specifically, the LSM argues that preserving and protecting the Cabildo is a core police power. We agree.
As we recognized in Board of Comm'rs of Orleans Levee Dist., a home rule entity can abridge the police power of the state if it exercises its powers in "an unreasonable, oppressive, arbitrary, or discriminatory manner." Id. at 252. While the facts of such did not appear in Board of Comm'rs of Orleans Levee Dist., such facts are clearly present in the case sub judice to warrant our ultimate conclusion.
There is no doubt that the Cabildo is quite possibly the most historically and architecturally important building in Louisiana. Indeed, the protection and preservation of the State's own property are core functions of the State. Thus, it is a vital interest of the State. As such, the Legislature has seen fit to enact statutory provisions to protect and preserve this historic landmark building and its contents. See, e.g., La.R.S. 25:342. Moreover, being charged with the statutory responsibility to maintain and preserve the Cabildo, the LSM would have been remiss in their duties and responsibilities if they had not taken those steps reasonably necessary and proper to ensure the safety and historical and architectural wealth of the Cabildo, and the health, safety, and welfare of the Cabildo's contents, staff, and visitors. Without question, it is clearly within the *758 State's police power under Article VI, § 9(B) and mandated by La.R.S. 25:342(B). The LSM is exercising the police power of the State in erecting a fence at the Cabildo to protect it, its contents, its staff, and its visitors. As La.R.S. 25:342(B)(3)(a) makes clear, the LSM has the mandatory custody and care of the Cabildo and must "maintain and preserve... the building[], [its] collections, and [its] exhibitions." See La.R.S. 25:342(B)(3)(a) (emphasis added). Clearly, the LSM has the primary function to maintain and preserve the Cabildo.[14]
While the court of appeal found that VCC ordinances and the LSM statute were compatible and could be effectuated in harmony, this finding is unnecessary for the conclusion that the VCC has acted arbitrarily, unreasonably, and capriciously in denying the permit for an architecturally and historically accurate fence. There is nothing in the record that would suggest that the decision of the VCC in denying the permit was that of a considered opinion. Before this case, the VCC has never attempted to require the LSM to seek a permit for renovation projects of the LSM in the Vieux Carré. These projects have included the $8 million renovation and repair to the Cabildo in 1988; the painting, renovations, and repairs to the U.S. Mint; the painting, renovations, and repairs to the Presbytére; and the painting, renovations, and repairs to the Lower Pontalba. The record shows the VCC was intimately involved with the erection of the fence at the Cabildo during the entire process. On November 17, 1995, the LSM notified the VCC of the intent to erect the fence at the Cabildo to deal with its safety and security problems. Indeed, the VCC expressed concern at this time that any fence at the Cabildo should be hand forged and an exact replica of the Presbytére fence. Also, it was the VCC's recommendation, through Mr. Cooper, that the LSM hire David Mudge as an expert in the field to design the technical specifications for the fence. Further, the VCC was involved in the approval process after the hand forged, precisely matched exemplary section of the fence was completed and presented for inspection and before fabrication of its remainder. Further, the ornamental iron fence around Jackson Square, originally known as Place d'Armes, is not an architecturally or historically accurate fence. Instead, the VCC allowed the City of New Orleans to erect a historically inaccurate fence around the square so that it could be locked at night to prevent public entry, the exact reason the LSM wanted to erect a fence at the Cabildo. It was only after completion of the fabrication process and prior to the erection of the fence at the Cabildo that the VCC took the arbitrary position that the LSM was required to seek and be issued a permit for the project. Nonetheless, even after the permit was applied for, the VCC's Architectural Committee, without assigning reasons, voted unanimously to recommend denial of the permit. Further, the VCC as a public body failed to act on this matter for more than three months after the committee's recommendation. Moreover, despite the fact that this matter was on the VCC's official agenda at least twice, the VCC ensured that it could take no vote during open sessions by having its members leave the room when the matter came up for a vote, thus preventing a quorum from being present and requiring the matter be tabled until the next meeting. Finally, two months after the VCC filed suit, a vote was taken by the VCC and it denied the permit, without assigning *759 reason. Thus, the natural consequence of the VCC's action and its denial of the permit without reason impermissibly interfered with and abridged the police power of the State.
It is difficult to conceive a case in which an arbitrary, capricious, or unreasonable exercise of authority could be more evident than from the facts of this case, i.e., the denial of the permit by the VCC. Perceiving more unreasonable, arbitrary, and capricious actions by the VCC are difficult, than to participate actively in the entire process from the selection of the fabrication expert to the condoning of the exemplary section of the fence designed for the protection and safety of the Cabildo, its contents, its staff, and its visitors, and then, after requiring an application be made with the VCC for the fence's erection, denying the permit without reason. As this Court has said, the duty imposed under the constitutional amendment "is not only to preserve the old buildings themselves, but to preserve the antiquity of the whole French and Spanish quarter, the tout ensemble,[15] so to speak, by defending this relic against iconoclasm or vandalism." City of New Orleans v. Levy, 223 La. 14, 64 So.2d 798, 801 (1953) (emphasis added). By its own actions, the VCC lulled the LSM into the reasonable belief that an architecturally and historically accurate fence at the Cabildo would be an acceptable alteration to effectively protect this State's landmark. Indeed, no other means would be more reasonable. By denying the permit, the VCC put the Cabildo, its contents, its staff, and its visitors at the continuing dangers caused by the daily loiterers. Whatever the reason the VCC may have had for denying the permit, it was unrelated to the trust imposed upon the City and the VCC for the public welfare and an impermissible interference with the State's police power.
When the "Duties" section of the constitutional amendment is read as a whole and in context, the VCC's authority over the private and semi-public buildings of the Vieux Carré is clearly limited to reasonable control. As such the City and the VCC in the exercise of this trust cannot act unreasonably, arbitrarily, and capriciously. Not only must the rules and regulations of the City and VCC be reasonable, City of New Orleans v. Impastato, 198 La. 206, 3 So.2d 559, 561 (1941), but they must also exercise those rules and regulations consistently, reasonably, and rationally.
This Court will not set aside the sound decisions of the City and VCC when those actions preserve and promote the constitutional trust imposed upon them. In determining whether their actions were arbitrary, capricious, or unreasonable we look for willful and unreasoning action, without consideration and in disregard of the facts and circumstances of the case. Conversely, their actions will not be considered arbitrary, capricious, or unreasonable when exercised reasonably and upon due consideration.
A party who seeks equitable relief, must not be pari delicto; that is, he himself must be free from any unlawful or inequitable conduct with respect to the matter or transaction in question. See, e.g., Carter v. Flanagan, 455 So.2d 689, 693 (La.App. 2 Cir.1984) (quoting Rhodes v. Miller, 189 La. 288, 179 So. 430 (1938)). Having originally participated actively in the fabrication and erection of an architecturally and historically accurate fence at the Cabildo, pursuing a course of conduct naturally calculated, if not deliberately intended, to cause the very conditions that led the VCC to seek equitable relief, this Court, when sitting in equity, will not entertain the relief sought. Thus, it is clear *760 from these legal precepts that the VCC is not entitled to a mandatory injunction.
Accordingly, this case presents one of those "unusual cases" where the law imposes an insurmountable bar to the relief sought by the VCC. The record easily supports a need for a fence to enclose the arcade of the Cabildo. This issue is not seriously debated. Nor is it disputed that the fence is architecturally and historically accurate in every respect. It is clear to us that the fence became a seriously debated issue only for reasons to define the authority of the VCC. We recognize that both the LSM and VCC serve important functions and responsibilities to this State under our Constitution and laws. These distinct bodies are complementary to each other and only become counterproductive when the focus becomes one of authority rather than function. Notwithstanding this observation, we conclude that the actions of the VCC and its denial of the permit for an architecturally and historically accurate fence impermissibly interfered with and abridged the police power of the State.

DECREE
For the foregoing reasons, we vacate and set aside the judgement of the court of appeal in full and reinstate the judgment of the trial court in all respects.
COURT OF APPEAL JUDGMENT VACATED; TRIAL COURT JUDGMENT REINSTATED.
LEMMON, J., concurs and assigns reasons.
KNOLL, J., assigns additional concurring reasons.
JOHNSON, J., concurs in result.
LEMMON, J., concurring
As the majority notes, one of the "core functions" of the State is to protect and preserve property owned by the State. When the State took steps to protect and preserve the Cabildo, as well as the health and welfare of its employees and visitors and other citizens, the State was exercising its police power.
The VCC's attempt to prevent the State's reasonable steps to protect and preserve the Cabildo was an infringement on the State's exercise of its police power,[1] which is prohibited by La. Const. art. VI, § 9(B). Accordingly, the majority properly reverses the injunction ordered by the court of appeal and reinstates the judgment of the trial court.
A second, but separate, ground for reversing the injunction is that the VCC's denial of the application for a permit to construct the fence was arbitrary and capricious, for the reasons stated by the majority. Significantly, the denial was arbitrary, irrespective of the status of the Louisiana State Museum as a State entity; the denial would have been just as arbitrary and capricious if the applicant had been a private individual.
KNOLL, Justice, assigning additional concurring reasons.[*]
In addition to the reason assigned as the organ for this Court, I write separately to address the issue of whether the VCC has jurisdiction over public buildings located within the Vieux Carré.[1] While the court of appeal concluded that the VCC had such jurisdiction, I conclude that by the clear language of the Constitution, the VCC's *761 jurisdiction is limited solely to a reasonable degree of control over "private and semi-public" buildings located within the Vieux Carré.
The constitutionally mandated jurisdiction of the VCC is not omnipotent. Rather, the Constitution authorizes the VCC's jurisdiction only for the exercise of a reasonable degree of control over private and semi-public building located within the Vieux Carré to prevent the impairment of the architectural and historical worth of its tout ensemble. The constitutionally limited duties of the VCC include reviewing applications for the erection of any new building or for alterations or additions to any existing building in the Vieux Carré, as far as they relate to the appearance, color, texture of materials and architectural design of the exterior. Additionally, the VCC is charged with the duty of promptly making recommendations to the City Council. The clear purpose of limiting the VCC's duties was to ensure that experts in historic and architectural preservation would assist the City Council's duty in maintaining and preserving the tout ensemble of the Vieux Carré. In the case sub judice, the LSM opposed the VCC's position that the LSM is required to seek and receive a permit from the VCC before any construction by filing an exception of no cause of action, urging that the VCC's jurisdiction does not include public buildings.
In interpreting amendments to our Constitution, courts should follow certain axioms. Generally, the Louisiana Constitution and its amendments are subject to the same rules of interpretation as other legislation. Succession of Lauga, 624 So.2d 1156, 1165 (La.1993). A constitutional provision is the solemn expression of the legislative will and the people who adopted it; thus, the interpretation of a constitutional provision is primarily the search for how the people who adopted it understood it, and not only how the drafters understood it. Id.; Cf. Hutchinson v. Patel, 93-2156 (La. 5/23/94), 637 So.2d 415. When a constitutional provision is clear and unambiguous and its application does not lead to absurd consequences, it shall be applied as a written, with no further interpretation made in search of the legislative intent. LA.CIV. CODE art. 9; Daigrepont v. Louisiana State Racing Comm'n, 95-0539 (La. App. 4 Cir. 10/26/95), 663 So.2d 840, writ denied, 95-2828 (La. 2/2/96), 666 So.2d 1085. The starting point for interpretation of any constitutional provision is the language of the provision itself. Touchard v. Williams, 617 So.2d 885 (La.1993).
Section 22(A) of the Constitution is supreme law. We must view any ordinance or action on that subject matter in the light of section 22(A)'s provisions. It is fundamental that no inferior enactment can violate the manifest tenor of our Constitution. We cannot consider only those portions of the constitutional amendment that deal with the discretionary authority of the City and the VCC in our deliberation.[2] Rather, we must consider the entirety of the amendment in determining its dictates. When the constitutional amendment is read as a whole and in context, the expressed terms "private and semi-public" are clear limitations on the constitutional grant of authority over buildings located within the Vieux Carré subject to the VCC's jurisdiction. That is, the constitutional provision is clear and unambiguous, and its application does not lead to absurd consequences; therefore, it must applied as written and no further interpretation may be made in search of the people who adopted it or its drafters' intent. LA.CIV. CODE art. 9; Daigrepont, 663 So.2d at 840. As much, the VCC, in the exercise of the trust in preserving the Vieux Carré imposed upon it by the Constitution, may not exercise control over those public *762 buildings entrusted to the LSM for the same purpose.
I agree with the court of appeal that the constitutional amendment evidenced a need for uniformity. However, I do not agree with the conclusion that the "language, `private and semi-public buildings' was meant to specifically include private and semi-public buildings, not to tacitly exclude public buildings."[3] such a conclusion of the constitutional provision reads out this clear limitation, reads in what is not there, and renders the words meaningless. Such a conclusion is an interpretation in search of the amendment's intent, violating our jurisprudential rules on statutory interpretation. Courts must afford a reasonable and practical effect to entire constitutional provisions over one that renders part of it meaningless or useless. Smith v. Cajun Insulation, Inc., 392 So.2d 398 (La.1980); J.M. Brown Const. Co. v. D & M Mech. Cont., Inc., 275 So.2d 401 (La.1973). Courts are required to give effect to all parts of a constitutional provision and not adopt constructions making any part superfluous, meaningless, or nugatory. First Nat'l Bank of Boston v. Beckwith Mach. Co., 94-2065 (La. 2/20/95), 650 So.2d 1148.
Instead of the erroneous interpretation by the court of appeal, I find that the "Duties" section of the amendment makes clear that the VCC's authority only extends to a "reasonable degree of control...over...private and semi-public buildings erected on or abutting the public streets of said Vieux Carré section." LA. CONST. art. XIV, § 22(A)(1921)(emphasis added). Thus, I conclude that by the clear and unambiguous language of our Constitution, the VCC lacks any jurisdictional authority over public buildings located within the Vieux Carré. Accordingly, by the clear and explicit terms of the Constitution, the law imposes an insurmountable bar to the relief sought by the VCC. Therefore, the trial court's granting of the LSM's exception of no cause of action and dismissal of the VCC's temporary restraining order and petition for injunctive relief was correct.
NOTES
[*] Kimball, J., not on panel. See Rule IV, Part 2, § 3.
[1] Because the fence at the Cabildo has been erected, whether the VCC is entitled to a temporary restraining order and a permanent injunction is moot. The only remaining issue is whether the VCC is entitled to a mandatory injunction directing the LSM to remove all vestiges of the constructed fence and to restore the Cabildo to its original condition.
[2] See City of New Orleans v. Board of Dirs. of the La. State Museum. 98-1170 (La.6/26/98), 719 So.2d 484.
[3] In reaching this conclusion, we pretermit the issue of whether the VCC's jurisdictions within the Vieux Carré includes "public" buildings as that determination is unnecessary for our resolution today.
[4] At the same time, the City transferred the Presbytére, formally the Civil District Court house for the City of New Orleans, to the LSM in perpetuity for museum purposes.
[5] Article VI, § 17 provides: "Existing constitutional authority for historic preservation commissions is retained." Significantly, the Constitutional Convention of 1973 specifically considered and rejected an amendment that would have deleted the VCC's constitutional authority and relegated section 22(A)'s provisions to statutory authority like all other state historic preservation commissions. XIX VERBATIM TRANSCRIPTS, Const. Conv. of 1973, at 56-61 (Oct. 2, 1973).
[6] Contrary to the VCC's assertion that the "VCC was created pursuant to the [City of New Orleans] Home Rule powers and the authority of the Louisiana Constitution," it is clear that the VCC was created prior to the City of New Orleans being granted Home Rule Charter authority. Section 22(A) was adopted fourteen years before the constitutional amendment authorizing Home Rule Charter status for the City of New Orleans. Compare Louisiana Constitution of 1921, Article XIV, § 22, as amended by 1950 La.Acts 551. This distinction is noteworthy because Article VI, § 17 of the 1974 Constitution retained Article XIV, § 22(A) of the 1921 Constitution, and, accordingly, the City's Home Rule Charter may not conflict with the provisions of section 22(A). LA. CONST. art. VI, § 4 (1974); see City of New Orleans v. Board of Comm'rs of Orleans Levee Dist., 93-0690 (La.7/5/94), 640 So.2d 237, 243-44 (holding that preexisting home rule municipalities and parishes may exercise within their boundaries any legislative powers not in conflict with the Constitution).
[7] For the City of New Orleans' current legislation regarding the VCC, see NEW ORLEANS, LA., CIVIL CODE Part I, ch. 7, §§ 5-701 to 5-703 and Part 2, art. 1, §§ 166-1 to 166-52. The text of C.C.S. No. 14,538 and the text of the City of New Orleans' current municipal ordinances dealing with the VCC are attached to this opinion as an unpublished appendix, which is made a part of the official record.
[8] Notably, Jackson Square, originally know as Place d'Armes, was not originally enclosed with a fence. Instead, the City of New Orleans, as the owner of Jackson Square, erected an architecturally and historically inaccurate fence to lock the Square at night and prevent ingress by trespassers. (R. at 77).
[9] The Presbytére was built in the late 1700s. Originally, the Presbytére's entire square was enclosed by a wood and masonry fence with a carriage gate. However, this fence was replaced in 1840 when an iron fence and two-leaf gate was added to enclose its arcade. See LEONARD V. HUBER, THE PRESBYTÉRE ON JACKSON SQUARE 18, 38 (1981).
[10] The LSM points out that no permit was required for the $8 million renovation and repair to the Cabildo in 1988; the renovations, repairs, and painting to the U.S. Mint; the renovations, repairs, and painting to the Presbytére; or the renovations, repairs, and painting to the Lower Pontalba.
[11] Although Attorney General opinions are merely advisory and not binding, the courts of this State have recognized their persuasive authority. See, e.g., State in Interest of J.M., 97-491 (La.App. 3 Cir. 10/29/97), 702 So.2d 994, 997.
[12] Mr. Cooper alleged that Mr. Sefcik informed him that the project would go forward that day and that State Police would be present to prevent "interference." Mr. Sefcik alleged that he called Mr. Cooper after being informed that Mr. Cooper threatened the contractor with imprisonment. Mr. Sefcik allegedly stated during this conversation that if the VCC intended to escalate the situation with such an act, then the State might respond with State troopers to defend its interest.
[13] The lingering risk and danger to the Cabildo and the unsavory condition created by unwelcome nightly visitors continued well into June 1997. Between May and June of 1997, incidents of urination, defecation, and vomiting on the Cabildo were documented, as well as incidents of individuals being intoxicated, belligerent, threatening, and indecently exposing themselves to the Cabildo's staff and visitors. In addition, one of the Museum Police Officers reported an incident where an individual, who had spent the night beneath the Cabildo's arcade, grabbed a pigeon, tore it open, and proceeded to consume it.
[14] As the court of appeal noted, the primary function of the LSM is to collect, preserve, and exhibit art relative to the history and culture of Louisiana. See La.R.S. 25:341. However, we do not agree with the court of appeal's conclusion that there is no express grant of power to the LSM to perform construction of alterations to the exterior or its buildings. Such a conclusion goes too far. Clearly if the construction or alteration of the building is for its maintenance or preservation, then La.R.S. 25:341 is an express grant of power.
[15] The tout ensemble describes the concept that preservation efforts must be directed not only at the antiquity of the buildings of the French and Spanish quarter, but also at the sum total effect of the Vieux Carré, buildings plus environment. See City of New Orleans v. Pergament, 198 La. 852, 5 So.2d 129 (1941).
[1] I emphasize, as my point of departure from the majority opinion, that it was the VCC's thwarting of the State's protective efforts that abridged the State's exercise of its police power, whether or not that thwarting was arbitrary and capricious.
[*] Kimball, J., not on panel. See Rule IV, Part 2, § 3.
[1] While I conclude that the LSM was under no constitutional duty to seek a permit from the VCC, the LSM, following the principle of comity suggested by Attorney General's Opinion No. 79-60, nonetheless sought a permit from the VCC. Accordingly, because the LSM purposefully availed itself of the VCC's jurisdiction, the resolution under the abridgment of State's police power is correct.
[2] The City and the VCC, for example, have discretionary authority under the Constitution to designate the buildings which in their opinion are considered worthy of preservation. See LA.CONST. art. XIV, § 22(A).
[3] The court of appeal also noted that because the New Orleans Charter and Code both refer only to "all buildings" and "buildings" this evidenced "an intent to include all building, whether public or private." Board of Dirs. of La. State Museum, 709 So.2d at 1013-14. However, this rational is misplaced. Despite what the City may have intended by its own provisions, the proper focus of the inquiry is on the constitutional provision, not the inferior Legislation. Succession of Lauga, 624 So.2d at 1165. Further, legislation of a home rule municipality or parish may not conflict with the Constitution. Board or Comm'rs of Orleans Levee Dist., 640 So.2d at 243-44.