. CARAWAY, J.
| tPlaintiff’s suit was dismissed by the trial court on the exception of no cause of action. The suit claims that the defendant casino allowed him for months exclusive use of a slot machine under representations that the machine “had to hit the jackpot soon.” From our review of the allegations of the petition, the grant of the exception of no cause" of action is affirmed for the following reasons.

Facts

By a lengthy and detailed petition with numerous paragraphs of allegations,[1] Matt Master presents claims against Red River Entertainment, LLC d/b/a Sam’s Town Casino and Hotel (hereinafter the “Casino”) for an alleged arrangement he was provided over a 16/é-month period for the exclusive gambling use of a specific slot machine. Master asserts that he and his wife began playing the “Triple Double Star Progressive Slot Machine” (hereinafter the “Machine”) on February 29 [sic], 2013. Through a “capping” allowance by the Casino’s management, Master could take breaks from playing.the Machine for 2 hours or longer and thereafter resume play on the Machine without anyone else having played it. Master’s playing on the Machine ended on July 14, 2014, after Master had filed a complaint with the State Gaming Commission (the “Commission”) to investigate why the Machine had never “hit” a jackpot.
| ¡Master asserts that the Machine was initially selected by his wife because “the progressive jackpot payout on the Machine *286 reflected that it was at approximately $101,000 and it was known that it had last hit the progressive jackpot 2 years earlier at approximately that same amount.” As Master played the Machine over the 16½ months, the progressive jackpot display increased gradually to $155,300. Along the way as this increase occurred, Master alleges that he was told by the Casino’s management that the Machine was probably at a point where a jackpot could be hit.
Master also alleges that as the time of his constant play on the Machine passed, he was granted longer “cap” times to 3 hours and then to 12 hours. He was also extended more privileges and accommodation at the Casino hotel. He asserts that in 2013 alone he lost over $500,000 on the Machine.
When the Casino and Master reached an impasse over Master’s complaint to the Commission and the Machine’s failure to “hit,” the Casino advised Master that he was banned from the Casino on July 24, 2014. This suit followed. .
Following the Casino’s filing of an exception of no cause of action, the trial court granted the exception, dismissing Master’s claims.

Discussion

Master argues on appeal three causes of action which warrant reversal of the trial court’s ruling.[2]
|sMaster first argues that an oral contract existed with the parties’ consent implied by their actions which under the circumstances were clearly, indicative of consent. See, La. C.C. art. 1927.[3] He also makes a detrimental reliance claim under Civil Code Article 1967.[4] Finally, he also asserts an unjust enrichment claim under Civil Code Article 2298.[5]
*287 Consideration of any of these three claims must begin with the identification of the object or cause of the parties’ dealings. Legal cause for conventional obligations “is the reason why. a party obligates himself.” La. C.C. art. 1967. With Master’s implied contract claim, the alleged performance expected of the Casino was (1) to allow continuously the exclusive use by Master of the Machine by the cápping arrangement, and (2) to ensure that the Casino’s information regarding the progressive jackpot for the Machine would hold true for a timely payoff to Master. As time passed and the fortuitous event of payoff never occurred, the Casino is alleged to |4have breached a contract for such performance by ending Master’s use of the Machine,
We find the broad assumption of Master’s claim about the object or cause of the parties’ dealings to be fatal to this action. A gaming device is understood by all as a game of chance with random outcomes. Louisiana law regulates gaming activities and defines as a crime the following improper alteration of a gaming device:
B. It is unlawful to mark, alter, or otherwise modify any gaming equipment, gaming device, or associated equipment in a manner that:
(1) Affects the result of a wager by determining win or-loss; or
(2) Alters the normal criteria of random selection, which affects the operation of a game or which determines the outcome of a game.
La. R.S. 27:30,5(B).
Master’s claims overall rest upon a broad, mistaken view that the Casino had represented to him that it could affect the random outcome of the Machine in Master’s favor by guaranteeing Master’s use of the Machine. Additionally, Master effectively claims that the Casino’s periodic posting of the progressive jackpot increases for the Machine was a representation to Master that the normal criterion of random selection through the operation of the Machine was altered in his favor. If true, such conduct, or promise of performance, by the Casino would violate the criminal and regulatory law-pertaining to gaming in Louisiana. “A contract'is absolutely null when it violates a rule of public order, as when the object of a contract is illicit or immoral.” La. C.C. art. 2030. ■ •
The meré fact that the Casino extended to Master many privileges and the “cap” time for the Machine presents no actionable claim. Yet, Master |fialleges that in conjunction with those privileges, the Casino management represented to him that the Machine “had tó hit the jackpot soon.” If this was merely a statement of the randomness of Master’s chancés oh the Machine, the representation was likewise not aetionablé.' Master could not reasonably rely to his detriment on that statement about a gaming device. If Master is implying by his allegations that the Casino guaranteed him by its actions and representations a result from the Machine for his benefit, the object of that promise or contract would be illicit and a criminal act. Accordingly, we find that the trial court’s dismissal of Master’s claims on the exception of no cause of action was correct and the judgment is affirmed.

Conclusion

For the foregoing reasons, the ruling of the trial court is affirmed. Costs of this appeal are assessed to Master.
AFFIRMED.
UNPUBLISHED ADDENDUM
, TO DOCKET NO. 50,479-CA
⅜ ■ ⅜ $ ¡ ⅜ - ⅜ ⅜
*288 PETITION FOR DAMAGES
íjí J¡* S{5 ⅜ ⅜
2.
On February 29, 2013, petitioner and his wife decided to celebrate their 25th anniversary at Sam’s Town Casino and Hotel where Mr. Master was granted an Onyx Level Status as a player on the day of their arrival and based upon his prior period of play at the defendant’s casino.
3.
Petitioner was informed that as an Onyx Level he was entitled to certain privileges at the hotel and casino. Onyx level players obtain those privileges by gambling larger amounts of money, as well as upon recommendation by Corporate Management as to which player would be accepted into the Onyx Level player’s status.
4.
After arrival at the same casino Mr. Master’s spouse began playing the Triple Double Star Progressive slot machine at the defendant’s premises. She selected that particular machine because the Progressive Jackpot payout on the machine reflected that it was at approximately $101,000.00 dollars and it was known that it had last hit the progressive jackpot 2 years earlier at approximately that same amount.
5.
The machine is owned by the defendant and the data reflected on it is under the control of the defendant.
6.
The petitioner decided that he wanted to hit a progressive jackpot on the machine and would play it in shifts with his spouse for 20 hours per day meeting onyx level “players privilege”. Defendant’s management allowed players such as petitioner to “cap” a particular machine, such as in this ease, for 2 hours and then resume play on the same machine without anyone else playing the same machine in accordance with onyx levels “players privilege” and management’s verbal agreement.
7.
Mr. Master and his spouse took turns playing the machine in accordance with management’s verbal agreement with each being able to cap the machine for 2 hours during the first 3 months.
JLl-
After approximately 3 months Mr. Master’s spouse decided to no longer continually play machine as the machine had not hit the progressive jackpot.
9.
Mr. Master decided that he would continue to play the machine and the defendant’s management agreed with the petitioner that the defendant would increase his “cap” time to 3 hours as an Onyx player if he continued to play.
■ 10.
During this time, the defendant extended other privileges to Mr. Master including granting of continuous hotel accommodations on the 23rd floor in one of the Luxury Suites, meals in the steakhouse upon request, and even granted longer “cap” times occasionally.
11.
Defendant was benefitting from this agreement due the fact it was obtaining substantial revenues from Mr. Master and also by his “coin in and out” play totals *289 from which casinos receive ■ industry and national recognition.
12.
At that point Mr.- Master met with an authorized representative of the defendant, to wit: the Director of Casino Operations and reached an agreement: The casino granted a “cap” time of 12 hours on the machine and Mr. Master had to play minimum of 1 hour to “cap” the machine again. After management verbally agreed to a 12 hour “cap” Mr. Master mentioned to the General Manager that he had heard a lot of players had complained to the management and others about the 12 hour “cap” time on the machine. The GM stated “_ em, I love confrontation”. And" further stated “When you hit the progressive I am going to find a way for you to have the machine. You have bought and paid for it multiple times over”.
13.
Thereafter Mr. Master continued to play and had multiple discussions with the Director of Casino Operations, the General Manager of the casino and the Assistant General Manager wherein he was told that the machine would probably,hit between $112,000 and $125,000.00. He detrimentally relied upon those representations by Senior Management as well as the past history of the machine and continued to play. During this lime, there were several separate occasions that management granted longer cap times, once up to 24 hours, and another where- the General Manager, The Director of Slot Operations and the Slot Executive Hostess took Mr. Master and his family to a- Texas Ranger’s ball game in Arlington in a suite for the day. Mr. Master was -told not to worry about the cap time requirements for that day.
_k14-
When the progressive jackpot payout got to approximately $130,000.00 Mr. Master met again'with the Director of Casino Operations and was told that the machine “had to hit the jackpot soon” as it had never gone that high in the past history of the machine.
15.
■When Mr. Master played until the machine went past $136,000.00, he met again with the Director of Casino Operations and was told the machine could go as high as $200,000.00 without hitting. Mr. Master pointed out that this information was different than the inducements made by management earlier.
As Petitioner played that evening, the Director brought the petitioner the “Parr sheet” on the machine stating “he hoped this helped him some”. Petitioner was told that the General Manager and that “Corporate” had given permission for petitioner to see the “Parr sheet”. The Parr sheet showed the machine had a life cycle of 1.95 million spins, in addition to other information.
17.
Petitioner had the machine checked by a slot tech at the end of April or beginning of May of 2014 and the percentage hold was at 90.5%.
18.
Thereafter and as petitioner played 2½ months more, "petitioner had the machine checked again with the percentage hold increasing to 91.5%.' Four months later was 92.5%. No one could provide any *290 explanation as to how the percentage hold had changed.
19.
Petitioner continued to play and later asked that the. machine not.be checked while he slept. The following .day the progressive jackpot “coin in” had changed while the machine was supposed to be “capped/lock down” and it reflected one coin having been played. This was contrary to the agreement of the parties. Mr. Master asked several slot staff what had happened and no one had an answer, He then asked for a meeting" with General Manager and Director of Slot Operations. The Director of Slot Operations initially stated that the machine had not been capped by mistaken, but immédiately changed the story and stated that maybe it had been uncapped for about 10 minutes stating one person had played the machine, but had not won anything of'significance.
20.
The petitioner was told by the employee who was supposed to have “capped” the machine" later that it wasn’t 10 minutes, and that she had thought |flshe had “capped” the machine but hadn’t. She also stated that it was uncapped for about 2 hours and 10 minutes, and multiple people had played it before management. The employee further stated she was given a day off without pay and was told that Mr. Master had came down 15 minutes later and had found that the machine had not been “capped”. Petitioner told her that was not true, and .that he had not noticed the progressive amount was. different from where he had left it at the night before and that it showed that one coin had been played. The next day Mr. Master met with the GM and Director of Slot machines after hearing about the employee being disciplined and that she had to sign a statement based on false information provided to her. Representatives of defendant, after trying to cover up the breach of their agreement, finally admitted to petitioner that several people had played had indeed played the machine but again no one had won “significant money”. Petitioner asked to see the “logbook” to verify what had happened. The “lock down” was not in the “log book”, and management began to become overtly deceptive to petitioner. At this time the Director of Slot Operations just said he had got conflicting reports and admitted to screwing up, and had found out the total story later but just didn’t admit it to petitioner and that it would not happen again.
21.
As petitioner continued to play and when the progressive jackpot display got to approximately $140,000.00, several of defendant’s employees encouraged petitioner to file a complaint with the State Gaming Commission and stated “this made no sense”, something “had to be wrong” and they felt petitioner was being “duped”.
22.
When petitioner reached the progressive figure of approximately $155,300.00, he registered a written complaint to the State Gaming Commission to investigate the machine. The complaint Petitioner filed with the state questioned why the progressive had not hit, since the history of the machine showed it had hit the progressive jackpots at significantly lower amounts.
23.
The machine was supposed to be locked down during testing and investigation, but the reels were not what they were when *291 petitioner had stopped play before lock-down. No explanation was given to petitioner.
24.
Petitioner requested another meeting with management and pointed out that his loss showed over $500,000.00 for 2013 alone, and that he had still not heard anything back from his original complaint. Mr. Master stated that after approximately 4 (four) months he should have heard |inmembers were present, including a corporate officer named Chris, the Slot Director of Operations, The General Manager and the Assistant General Manager. Mr. Master stated that he felt very uncomfortable with four of them there and just himself. Chris, who conducted the meeting, stated that Mr. Master wasn’t happy there, to which petitioner responded that he had never said that and that they were putting words in his mouth. “Chris” continued to state that this was not a very good business deal for them and he had heard a rumor the Petitioner had filed legal action against the casino. Mr. Master stated that no lawsuit had been filed at that time. The only written complaint that had been filed was with the State Gaming Commission, which Mr. Master stated he had legal right to verify operation and integrity of the machine. Mr. Master also stated that according to the “Parr sheer” he had seen, the machine would have already hit. “Chris” then stated that they did not want petitioner’s business; that he was not welcome there; and should play elsewhere. Petitioner was then told that he was banned from the casino and all of his Onyx bonus points, cash earned, and status was revoked. Petitioner was then told to return to the hotel and pack his belongings. A bellhop and security/dispatched to escort Petitioner to his vehicle and to see that Mr. Master left the property without “making a scene”. Petitioner’s agent then further advised petitioner that as of midnight of July 14, 2014, he was not allowed his due cap, and that he was told that there would be no further cap time allowed on the machine.

. We attach as an unpublished appendix the petition’s allegations. The record reflects that the original petition skips from paragraph 24 to 28. At the time of lodging, it was confirmed with the trial court that the original petition filed with the district court also was missing these paragraphs.

. The peremptory exception of no cause of action questions whether the law extends a remedy to anyone under the factual allegations of the petition. Rangel v. Denny, 47,381 (La.App.2d Cir.8/8/12), 104 So.3d 68. The burden of showing that the plaintiff has stated no cause of action is upon the exceptor. City of New Orleans v. Board of Directors of La. State Museum, 98-1170 (La.3/2/99), 739 So.2d 748; Villareal v. 6494 Homes, LLC, 48,302 (La.App.2d Cir.8/7/13), 121 So.3d 1246. The exception is triable on the face of the petition and the well-pleaded facts in the petition and any annexed documents must be accepted as true. Villareal, supra. A court of appeal reviews de novo a ruling sustaining an exception of no cause of action because the exception raises a question of law and the lower court’s decision is generally, based only on the sufficiency of the petition. The question is whether, in the light most favorable to the plaintiff, the petition- states any valid cause of action for relief. Id. ■

. Master actually cites former Civil Code Article 1811 (1870), which is not specifically addressed in the revised Civil Code.

. A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying. Recovery may be limited to the expenses incurred or the damages suffered as a result of the promisee’s reliance on the promise. Reliance on a gratuitous promise made without required formalities is not reasonable.

. A person who has been enriched without cause at the expense of another person is bound to compensate that person. The term ‘‘without cause” is used in this context to exclude cases in which the enrichment results from a valid juridical act or the law.' The remedy declared here is subsidiary and shall not be available if the law provides another remedy for the impoverishment or declares a contrary rule.
The amount of compensation due is measured by the extent to which one has been enriched or the other has been impoverished, whichever is-less.
The extent of the enrichment or impoverishment is measured as of the time- the suit is brought or, according to the circumstances, as of the time the judgment is rendered.