MAX N. TOBIAS, JR., Judge.
In this on-going litigation between the New Orleans Firefighters Local 632 (hereinafter “the Firefighters”) on one side, and the City of New Orleans (hereinafter “the City” or “City”) and the New Orleans Civil Service Commission (hereinafter “the Commission” or “Commission”) on the other, we are called upon to review the final judgment rendered by the trial court, which awarded the Firefighters damages in the principal amount of $176,183,448.39, plus annual leave days, legal interest, $24,130,682.45 in employer pension contributions, and an adjustment to the base pay of the class members to include all longevity raises that they should have received under the law. All parties have appealed the judgment in all or various respects. For the reasons set forth below, we amend in part, affirm in part, reverse in part, and remand to the trial court for recalculation of damages.
*215 In 1981, the Firefighters filed a class action against the City and certain City officials, and later joined the Commission and its Director. The action primarily challenged Commission Rule VIII, § 1.2, which established a “use it or lose it” policy concerning the Firefighters’ use of accumulated annual leave in excess of ninety days (or forty-five days, depending on the date of hire of the particular | fireman). The Firefighters contended that the City’s implementation of the “use it or lose it” policy violated La. R.S. 33:1996, which provides for entitlement to annual vacation days and further provides that “[the] vacation privileges herein provided shall not be forfeited by any member of the department for any cause.... ”
Subsequently, the Firefighters amended their petition in 1993 to assert that (1) La. R.S. 33:1996 provides for accrual of more annual leave per year than allowed by Commission Rule VIII, § 1.1, and (2) Commission Rule IV, § 8.1 provides for less frequent longevity pay increases than is required by La. R.S. 33:1992(B). In this respect, the Firefighters also claimed that Commission Rule IV, § 8.1 fails to consider their actual salary (base pay plus accrued longevity) in the computation of longevity pay increases.
After lengthy preliminary proceedings, the trial court on 19 July 1993 certified the class, dividing the Firefighters into three classes. Class One consisted of all active and retired firefighters who forfeited accrued annual leave under the “use it or lose it” policy. Class Two consisted of all firefighters who were denied the full measure of annual leave days. Class Three consisted of all firefighters who were deprived of the full longevity pay increases.
Thereafter, the Firefighters moved for partial summary judgment on the issue of liability. The City responded with several constitutional and statutory arguments. In April 1999, the trial court rendered a partial summary judgment in favor of the Firefighters, ruling that (1) the members of Class One, who forfeited accrued annual leave by operation of Commission Rule VIII, §§ 1.2 and 1.3, were entitled to back pay and future pay, ^subject to any applicable set-offs and credits; (2) the members of Class Two, who were denied their full annual leave entitlement because of Commission Rule VIII, § 1.1, were entitled to back pay and future pay, subject to a credit for any payments they may have received; and (3) the members of Class Three, whose annual longevity pay increases were limited by operation of Commission Rule IV, § 8.1, were entitled back pay and future pay, subject to a credit for any payments they may have received. The court certified the judgment for immediate appeal pursuant to La. C.C.P. art. 1915(B)(1). We affirmed the judgment. See 99-1995 (La.App. 4 Cir. 6/7/00), 767 So.2d 112. The Supreme Court granted certiorari to review the trial court’s rulings; the Court affirmed in part, reversed in part, and remanded for a trial on the merits.
On remand, the trial court found substantially in favor of the Firefighters. It awarded the Firefighters past longevity raises from 1979 to run from the third year to the twenty-third year of service. It also determined that back longevity raise calculations be performed on a compounding basis on base or actual pay, which includes City base pay, supplemental pay, millage pay, and scheduled and unscheduled overtime pay. The court granted the City credits for the years in which it gave the Firefighters a 2.5% civil service longevity increase, but not for those years in which a general raise was realized for all City employees. The trial court also awarded the Firefighters back annual leave days based on the “exigible” *216 dates established in the court’s 4 September 2002 judgment. It also awarded individual firefighters compensation for all annual leave they were denied due to on-the-job injuries or manpower shortages. Finally, the trial court held that the base pay of the class members (active and retired) be immediately adjusted to include all longevity raises they should have received pursuant to La. R.S. 33:1992(B), including those accrued outside of the 14 July 1978 prescriptive period for purposes of current and future pay, as well as for calculation of back pay due under the judgment.[1]
This case has produced two significant Louisiana Supreme Court opinions. In 1982, the Court was confronted with the problem of determining the allocation of constitutional power between the Louisiana Legislature and the Commission to make rules of law establishing New Orleans firefighters’ minimum and overtime wages. New Orleans Firefighters Assoc. v. Civil Serv. Comm’n of the City of N.O., 422 So.2d 402 (La.1982) (hereinafter “Firefighters I”). The Court held that La. Const. art. VI, § 14 expressly reserved to the Legislature the authority to establish statewide rules providing for minimum wages and working conditions for firemen. Noting further that the “plenary legislative power to adopt laws providing for minimum wages and working conditions of municipal policemen and firemen does not yield to the Civil Service Commission’s power to adopt uniform pay plans,” id. at 411, the Court determined that the firemen’s wage laws were not “an attempt by the legislature to fix salaries or amend a civil service pay plan but ... [were] a good faith effort to set a floor under wages and a ceiling over hours pursuant to a consistent statewide public policy.” Id. at 414. In addition, the Court held that “[a] fireman’s usual salary includes at least the total amount of compensation guaranteed to him by law under both minimum wage and supplemental salary statutes.” Id. at 413.
Finally, the Court, finding that its previous opinions in Louisiana Civil Service League v. Forbes, 258 La. 390, 246 So.2d 800 (1971) and Barnett v. Develle, 289 So.2d 129 (La.1974) did not govern the case before it, held that the obstacles to the legislation found in those decisions under the 1921 Louisiana Constitution, as amended, were removed by the adoption of the 1974 Constitution. Id. The Court perceived no adequate grounds for adjudging that a reenactment of La. R.S. 33:1992, the firemen’s minimum wage law, was required before it could have the effect within the City which it had always had throughout the state. Id. at 414.
The second opinion of the Supreme Court in this case came in 2001, at which time the Court considered the principal issues of whether the Fireman’s Minimum Wages and Maximum Hours Law, La. R.S. 33:1991-99, was violated (1) by the “use it or lose it” policy in the Rules of the Commission regarding the accumulation of annual leave, or (2) by the Rules of the Commission regarding longevity pay increases. New Orleans Firefighters Local 632 v. The City of New Orleans, 2000-1921 *217 (La.5/25/01), 788 So.2d 1166 (hereinafter “Firefighters II”).[2] As to the first issue, the Court held that “La. R.S. 33:1996 does not either grant or deny firemen the right to carry forward earned vacation days to future years. The statute simply is silent on the issue and therefore is not in conflict, on its face, with Commission Rule VIII, § 1.2.”[3] Id. at p. 7, 788 So.2d at 1171.
However, the Court did find that Commission Rule IV, § 8.1 clearly violated La. R.S. 33:1992(B), which by its terms was applicable to “each member of the fire department” and not only to those who were paid the statutory minimum salary.
The City simply chose to disregard the statute that clearly mandates the amount and frequency of longevity pay increases for all firemen, and to justify this conduct on the basis that the City pays higher than minimum base salaries. This court cannot allow the statute to be disregarded, and the City’s recourse rests with the Legislature.
Id. at p. 9, 788 So.2d at 1172. Consequently, the summary judgments of the lower courts were reversed as to back pay and future pay that were held to be forfeited by operation of Commission Rule VIII, § 1.2, and that portion of the motions for summary judgment was denied. In all other respects, the summary judgments of the lower courts were affirmed, and the case was remanded.
On the appeal currently before this court, the City has assigned ten errors for review. They are as follows:
1. The trial court’s judgment, awarding damages based upon the City’s alleged violation of La. Rev. Stats. 33:1992(B) and 33:1996, was clearly erroneous in that both statutes have been declared to be unconstitutional, as applied to the City of New Orleans.
2. The trial court erred in finding that plaintiffs’ 1993 petition amendment, wherein plaintiffs first raised their longevity wage claim, related back to the filing of their original petition in 1981. Accordingly, the trial court also erred in calculating damages arising from the longevity wage claim from 1978, three years prior the filing of their original petition, rather than from 1990, three years prior to the filing of the amendment.
3. The trial court erred in denying the City the right to receive full credit against the amount of State-mandated longevity pay raises due to the firefighters for all of the discretionary pay raises that were given by the City to the firefighters during the relevant time period.
4. The trial court erred in including State Supplemental Pay and dedicated millage funds in calculating the amount of back pay due to the firefighters for their longevity wage claim.
*218 5. The trial court erred in holding that La.Rev.Stat. 33:1992(B) requires the City to provide the State-mandated longevity increases to firefighters from the third year of service through the twenty-third year of service, rather than from the third year of service through the twentieth year of service.
6. The trial court erred in holding that the calculation of damages for back pay for the State-mandated longevity raises, as well as prospective pay, must include State-mandated longevity raises that fall outside of the prescriptive period.
7. The trial court erred in concluding that La. Rev. Stats. 33:1992 and 33:1996 are constitutional as applied to the City of New Orleans.
8. The trial court erred in holding that the City violated La.Rev.Stat. 33:1996 by denying firefighters a reasonable opportunity to use their annual leave.
9. Assuming, arguendo, that the City’s policy on limiting the accrual of annual leave did violate La.Rev. Stat. 33:1996, the trial court erred in failing to limit the calculation of damages for such violation to the period arising on or after November 21, 1991, the effective date of the amendment to Section 14 of Article 6 of the Louisiana Constitution, which added vacation benefits of firefighters as an exception to the general prohibition against the imposition by the State of unfunded mandates upon political subdivisions, such as the City.
10.The trial court erred in denying the City’s request for leave to amend its answer upon remand and in refusing to consider the City’s affirmative defense to plaintiffs’ back pay claims based on the doctrine of laches and equitable estoppel.
The Commission has also appealed, assigning four errors for review. They are:
1. The trial court erred in ruling that the Firefighters are entitled to the statutory mandated longevity raises as well as to other pay increases given to all employees.
2. The trial court erred by using a year-by-year calculation for the purposes of back pay, when it should have subtracted the total amount of wage increases received from the amount that is due.
3. The trial court erred by including millage pay as a component of the Firefighter’s base pay.
4. The trial court erred by including state supplemental pay as a component of the Firefighter’s base pay.
The Firefighters answered the appeal and have assigned two errors for our review. First, they contend that the trial court abused its discretion by failing to amend the judgment to include class members who were omitted from the data provided by the City. Second, the Firefighters argue that the trial court erred by retroactively applying 45 and 90-day caps to its award of past due annual leave because they were never given an opportunity to use their annual leave days.
I.
As we read the City’s brief, assignments of error one and seven are substantially similar and, therefore, will be addressed together. In these, the City contends that La. R.S. 33:1992(B) and La. R.S. 33:1996 are unconstitutional as applied to the City of New Orleans. In essence, the City argues that Firefighters II, which held that the constitutional arguments asserted by the City were decided in Firefighters I, *219 is wrong and should be ignored by this court.
In Firefighters I, the Supreme Court stated:
The previous opinions of this court in Louisiana Civil Service League v. Forbes, 258 La. 390, 246 So.2d 800 (1971) and Barnette[Barnett] v. Develle, 289 So.2d 129 (La.1974) do not govern this ease. The obstacles to the legislation found in those decisions under the 1921 Louisiana Constitution, as amended, have been removed by the adoption of the 1974 Constitution.
[[Image here]]
This court’s holding in Barnette[Barnett] that the firemen’s minimum wage law is unconstitutional as applied to the City of New Orleans did not mean that the statute could not be applied elsewhere within the state. We have accepted the principle that language broad enough to be applied both validly and invalidly may be restricted to those applications within the legislative authority, when such a result conforms to what the legislature intended and does not destroy the fundamental purpose of the act. State v. Johnson, 343 So.2d 705 (La.1977); Roy v. Edwards, 294 So.2d 507 (La.1974); Mims v. West Baton Rouge Parish School Board, 315 So.2d 349 (La.App. 1st Cir.1975); 2 Sands, Sutherland Statutory Construction, § 44.17 (4th ed.1973). The aim of the firemen’s minimum wage law is to set a floor under wages and a ceiling over hours for all firemen in cities of 12,000 or more and all paid firemen in other departments. Therefore, the removal of the City of New Orleans from the ambit of the statute by judicial interpretation did not destroy the statute’s fundamental purpose or utility.
Consequently, this is not a case of a law, or a distinct and separable part of a law, enacted in the unauthorized exercise of a power completely denied to the Legislature, Etchison Drilling Co. v. Flournoy, 131 La. 442, 59 So. 867 (1912), but of a law which it was competent for the lawmakers to pass, but which could not operate within the City of New Orleans during the existence of the 1921 Louisiana Constitution’s civil service provisions. The 1974 Louisiana Constitution, which modified these provisions and expressly reserved the legislature’s plenary power on the subject matter in question, removed the obstacle. Additionally, upon careful reflection, we do not view the firemen’s minimum wage law as an attempt by the legislature to fix salaries or to amend a civil service pay plan but as a good faith effort to set a floor under wages and a ceiling over hours pursuant to a consistent statewide public policy. We perceive, therefore, no adequate grounds for adjudging that a reenactment of the statute was required before it could have the effect within the city which it had always had throughout the state. Cf., Wilkerson v. Rahrer, 140 U.S. 545, 11 S.Ct. 865, 35 L.Ed. 572 (1890).
Id. at 413, 414.
We are bound by the holdings of the Supreme Court as set forth above. Therefore, the statutes in question are constitutional as applied to the City. We recognize, however, that the Firefighters II court did not address La. Const. art. VI, § 6 (1974), which preserves the autonomy of local governments in most situations.
The Supreme Court, however, examined La. Const. art. VI, § 6 (1974) in Morial v. Smith & Wesson Corp., 2000-1132 (La.4/3/01), 785 So.2d 1, cert. denied, 534 U.S. 951, 122 S.Ct. 346, 151 L.Ed.2d 262 (2001), in which the mayor and the City *220 filed suit against the firearms industry for damages allegedly suffered by the City related to the manufacture, marketing, promotion, and sale of unreasonably dangerous firearms. Subsequently, the legislature enacted La. R.S. 40:1799, which precluded such suits by abolishing the City’s right of action and reserving the authority to bring such suits to the state. The City challenged the constitutionality of the statute on several grounds. The Court concluded that the statute could be retroactively applied to the City’s suit as it was enacted pursuant to a reasonable exercise of the state’s police power.[4]
In analyzing the issues before it, the Court stated:
The City of New Orleans is governed by the provisions of a home rule charter enacted prior to the 1974 Louisiana Constitution. These pre-existing home rule charters were continued, and essentially constitutionalized, City of New Orleans v. Board of Comm’rs of Orleans Levee Dist., 93-0690, p. 8 (La.7/5/94), 640 So.2d 237, 244, by La. Const. art. VI, § 4. This section provides:
Every home rule charter or plan of government existing or adopted when this constitution is adopted shall remain in effect and may be amended, modified, or repealed as provided therein. Except as inconsistent with this constitution, each local governmental subdivision which has adopted such a home rule charter or plan of government shall retain the powers, functions, and duties in effect when this constitution is adopted. If its charter permits, each of them also shall have the right to powers and functions granted to other local governmental subdivisions.
Although “ ‘home rule’ does not mean complete autonomy,” Miller v. Oubre, 96-2022 at p. 9 [La. 10/15/96], 682 So.2d [231] at 236, this court has recognized that, in affairs of local concern, a home rule charter government possesses “powers which within its jurisdiction are as broad as that of the state, except when limited by the constitution, laws permitted by the constitution, or its own home rule charter.” Francis v. Morial, 455 So.2d 1168, 1171 (La.1984).
Article VI also fosters local self-government by giving home rule entities “the discretion to deploy their powers and functions on the local level, which may not be revoked, changed or affected by law unless necessary to prevent an abridgement of the reasonable exercise of the state’s police power.” Id. La. Const. art. VI, § 6 provides:
The legislature shall enact no law the effect of which changes or affects the structure and organization or the particular distribution and redistribution of the powers and functions of any local governmental subdivision which operates under a home rule charter.
This Section was added to Article VI to protect home rule governments from unwarranted interference in their internal affairs by state government. Francis, 455 So.2d at 1171.
To ensure that the powers granted to home rule governments would not be used to deprive the state government of its inherent powers, Section 9(B) was added to Article VI as a counterbalance. Id. at 1172. This section, entitled “Limi *221 tations of Local Government Subdivisions,” provides:
Notwithstanding any provision of this Article, the police power of the state shall never be abridged.
This provision was adopted “as a principle of harmonizing the replete home rule powers granted local governments with a basic residuum of the state’s power to initiate legislation and regulation necessary to protect and promote the vital interests of its people as a whole.” City of New Orleans, 93-0690 at p. 20, 640 So.2d at 249. This section has also been characterized as “a positive reaffir-mance of the supremacy of the state’s police power.” Lafourche Parish Council v. Autin, 94-0985, p. 18 (La.12/9/94), 648 So.2d 343, 357.
Although the police power of the state is best defined on a case by case basis, it has been generally described as the state’s “inherent power to govern persons and things, within constitutional limits, for promotion of general health, safety, welfare, and morals.” City of New Orleans v. Board of Directors of Louisiana State Museum, 98-1170, p. 11 (La.3/2/99), 739 So.2d 748, 757. See also Polk v. Edwards, 626 So.2d 1128, 1142 [La.1993]; Francis, 455 So.2d at 1172. The police power extends only to measures that are reasonable. City of New Orleans v. Board of Directors of Louisiana State Museum, 98-1170 at p. 11, 739 So.2d at 757; Francis, 455 So.2d at 1172. A measure taken under the state’s police power is reasonable when the action is, under all the circumstances, reasonably necessary and designed to accomplish a purpose properly falling within the scope of the police power. City of New Orleans v. Board of Directors of Louisiana State Museum, 98-1170 at p. 11, 739 So.2d at 757. Thus, to sustain an action under the state’s police, power, courts must be able to see that its operation tends in some degree to prevent an offense or evil or otherwise to preserve public health, safety, welfare or morals. Id. Further, an exercise of the state’s police power “does not justify an interference with constitutional rights which is entirely out of proportion to any benefit redounding to the public.” City of Baton Rouge v. Williams, 95-0308, p. 6 (La.10/16/95), 661 So.2d 445, 449 (quoting Francis, 455 So.2d at 1173).
Id. at pp. 16-19, 785 So.2d at 14-15.
We find that the statutes setting forth minimum wage laws for firefighters are a valid exercise of the state’s police powers because the statutes in question preserve the public health, safety, and welfare of the citizenry of the state.[5] Thus, we find that La. R.S. 33:1992(B) and La. R.S. 33:1996 are constitutional as applied to the City pursuant to La. Const. art. VI, § 9(B). Consequently, we find no merit to assignments of error one and seven.
II.
The City’s second assignment of error concerns the Firefighter’s 1993 second amended petition, which asserted a cause of action for longevity raises. The trial court held that the 1993 petition related back to the filing of the original petition in 1981. The Firefighters contend that because they satisfied the requirements of La. C.C.P. art. 1153, the trial court was correct.
La. C.C.P. art. 1153 provides as follows:
*222 When the action or defense asserted in the amended petition or answer arises out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the filing of the original pleading.
We have reviewed the original and amended petitions filed by the Firefighters. The original petition asserted claims relative only to annual leave — the implementation of the “use it or lose it” policy contained in the Commission’s rules. In the 1985 amendment, the Firefighters added the Commission as a defendant and stated new claims relative to the alleged forfeiture of annual leave, specifically citing La. R.S. 38:1996. The 1993 amended petition, for the first time, asserted claims for longevity raises pursuant to La. R.S. 33:1992(B).
In Phillips v. Palumbo, 94-1323 (La.App. 4 Cir. 12/15/94), 648 So.2d 40, this Court addressed the issue of whether a late-filed consortium claim could relate back to the original petition for the plaintiffs damages from an automobile accident. The original petition was filed in 1991 and two years later, the plaintiff filed a supplemental petition seeking to add his wife as a new plaintiff with a loss of consortium claim. We stated as follows:
In Giroir v. South Louisiana Medical Center, 475 So.2d 1040 (La.1985), the Louisiana Supreme Court established a four part [sic] test for determining whether | lfian amended petition adding a new plaintiff relates back under La. C.C.P. art. 1153. Giroir stated:
[A]n amendment adding or substituting a plaintiff should be allowed to relate back if (1) the amended claim arises out of the same conduct, transaction, or occurrence set forth in the original pleading; (2) the defendant either knew or should have known of the existence and involvement of the new plaintiff; (3) the new and the old plaintiffs are sufficiently related so that the added or substituted party is not wholly new or unrelated; (4) the defendant will not be prejudiced in preparing and conducting his defense.
Id., 475 So.2d at 1044.
In this case, it is undisputed that factors (1) and (3) of the Giroir test are satisfied. In addressing Giroir factor (2), Mrs. Palumbo argues that documents in the record show that defendants knew or should have known of her existence and involvement in Mr. Pa-lumbo’s case. State Farm does not directly refute Mrs. Palumbo’s contention that it was aware of her existence. State Farm argues, however, that even if it was aware of Mrs. Palumbo’s existence, it had no reason to believe that she would become involved in this case. In drawing a distinction between the terms “existence” and “involvement” in factor (2) of the Giroir test, State Farm’s argument spills over into the prejudicial concerns embodied in factor (4) of the Giroir test. Rather than recognize a technical distinction between the “existence” and “involvement” of the new plaintiff, we turn to factor (4), which is dispositive of this case.
In Faraldo v. Hanover Ins. Co., 600 So.2d 81 (La.App. 4th Cir.1992), under facts similar to this case, we set forth the following analysis of Giroir factor (4):
Although an amendment setting forth a wholly new cause of action can relate back to the date of filing of the original petition under La. C.C.P. art. 1153, this factor weighs against relating back. See Poirier [v. Browning Ferris Industries, 517 So.2d 998 (La.App. 3rd Cir.1987), writ den. 519 So.2d 105 (La.1987)]. Generally, a *223 defendant is more likely to be prejudiced by the addition of a wholly new cause of action than by the addition of a new plaintiff asserting the same claim the defendant is already preparing to defend against. Also, the passage of time between the filing of the original petition and the amended petition will generally weigh against the relating back of the amendment. See Giroir, 475 So.2d at 1045.
Defending against Mrs. Faraldo’s claim for loss of consortium would require considerably more time and effort on the part of defense counsel than was required of defense counsel in Giroir, where there was no additional cause of action asserted by the newly added plaintiffs. Counsel for plaintiff stresses that the amended petition was filed in early 1988, giving defendants plenty of time to prepare to defend against Mrs. Faraldo’s claims. However, given the often lengthy litigation process, this will frequently be the case. The amended petition setting forth Mrs. Faraldo’s cause of action for loss of consortium was not filed until 14 months after the date of filing of the original petition. Considering these factors, we also find that the fourth prong of the Giroir test was not met. Id., 600 So.2d at 84-85; see also Morton v. Ray, 611 So.2d 841 (La.App. 4th Cir.1992), writ den. 618 So.2d 404 (La.1993); Wood on Behalf of Hayes v. Hayes, 524 So.2d 241 (La.App. 5th Cir.1988).
Id. at pp. 2-3, 648 So.2d at 41-42.
In the instant case, we are faced with the filing of a new cause of action for longevity raises 12 years after the filing of the original petition. Longevity raises were neither directly nor indirectly pleaded in the original or 1985 amended petition. There was no way the City knew or could have known that a cause of action pursuant to La. R.S. 33:1992(13) would be asserted. These factors weigh against and actually preclude the relating back of the amendment. The 1993 amendment sets forth a new cause of action that arose under a wholly different statute than the one first sued upon. We find substantial prejudice to the defendants as a result of the inordinate and unexplained delay of the Firefighters to assert their cause of action for longevity pay. Therefore, we find that the trial court erred in awarding damages for longevity pay raises back to 14 July 1978, three years before the filing of the original petition on 14 July 1981. Instead, longevity pay raises should be awarded from 2 March 1990, three years before the filing of the second amended petition, in accordance with La. C.C. art. 3494.[6] In this respect, the judgment is amended.
III.
The City’s third assignment of error is that the trial court erred in denying it the right to receive full credit against the amount of state-mandated longevity raises under La. R.S. 33:1992(B) for all discretionary raises that were given by the City during the relevant time period. In response, the Firefighters contend that the trial court was correct when it gave a credit only for the periodic longevity raises given by the City under the civil service rules.
The interpretation of a law involves primarily the search for the legislative intent. Ruiz v. Oniate, 97-2412, p. 4 (La.5/19/98), 713 So.2d 442, 444. However, where the terms of a statute are unambiguous and do not lead to absurd results, the statute *224 should be interpreted according to its terms.
La. R.S. 33:1992(B) provides as follows:
From and after the first day of August, 1962, each member of the fire department who has had three years continuous service shall receive an increase in salary of two percent and shall thereafter receive an increase in salary of two percent for each year of additional service up to and including twenty years. Both the base pay and accrued longevity shall be used in computing such longevity pay.
The only jurisprudence addressing the issue of credits for longevity raises is Turner v. City of Shreveport, 437 So.2d 961 (La.App. 2 Cir.), writ denied, 442 So.2d 468 (La.1983). The trial court in the case at bar found that a “Turner offset” would not apply under the facts of the case before it. In reaching this conclusion, the trial court relied on the testimony of Commission Director J. Michael Doyle, who stated that historically there was never an offset implemented in pay raise years as to those City employees, including the Firefighters who received the 2.5% civil service longevity increases issued pursuant to Commission Rule IV, § 8.1.[7] Former City Councilman James Singleton confirmed that offsets were never taken.
In Turner, the employees of Shreveport’s municipal fire department brought a class action against the City of Shreveport for recovery of longevity pay raises due pursuant to La. R.S. 33:1992. The evidence revealed that from 1962 to 1968 official “longevity raises” were given to members of the fire department. Thereafter, until 1981, various raises were given to the firefighters, but these raises were not designated as “longevity increases.” One of the issues on appeal was whether the trial court correctly held that the City of Shreveport was entitled to a credit against the mandated longevity pay raises for any annual increase in the firefighters’ salaries, regardless of how designated.
After examining the legislative history of La. R.S. 33:1992, the Second Circuit stated:
In summary, we conclude that Section 1992 in its entirety continues to require certain municipalities to pay firefighters stipulated minimum salaries, which must include longevity increases after three years continuous service. However, our discernment of legislative intent in conjunction with a commonsense approach to the issue dictate the conclusion that, if this mandated increase is paid, regardless of whether described expressly as a “longevity pay increase” or not, the municipality has complied with Section 1992. Consequently, we find that the district judge correctly disposed of this pivotal issue.
Id. at 965.
We find Turner persuasive authority. While La. R.S. 33:1992 is silent on the issue of credits, we agree with the Second Circuit that the purpose of the section is to ensure that firefighters in certain municipalities, such as New Orleans, receive stipulated minimum salaries. Although the discretionary raises were not designated as “longevity pay increases,” the first 2% of each raise qualifies as such under Turner. Therefore, we find that the City should receive a credit of 2% in the years in which “city-wide” pay raises were given. That portion of the judgment is reversed.
However, we disagree with the City’s reasoning that pay increases of more than 2% be credited to years in which longevity *225 pay increases were not given. The fact that the City chose to give raises in excess of those required by law should not, and did not, prejudice the Firefighters. In that regard, the assignment of error is without merit.
IV.
The City’s next assignment of error concerns the definition of “base pay.” The trial court ordered that the City pay to each class member longevity back pay that would be “formulated [upon] City base pay, State Supplemental Pay, millage pay and scheduled and unscheduled overtime pay.” The City argues that “base pay” does not include State Supplemental Pay or millage pay received by the Firefighters.
 Although argued to the contrary by the City, we find that the Supreme Court has determined and settled the issue as far as supplemental pay is concerned. In Firefighters I, the Court stated:
Consequently, a fair and ungrudging construction of the Louisiana firemen’s supplemental salary law demands that it be read in pari materia with the firemen’s minimum wage law. Supplemental pay must be considered as part of the floor under wages for purposes of determining overtime wages in order to avoid a strained interpretation and give full effect to the remedial and humanitarian purpose of the statutes. R.S. 33:1994 provides that overtime wages shall amount to one and one-half times a fireman’s usual salary. A fireman’s usual salary includes at least the total amount of compensation guaranteed to him by law under both minimum wage and supplemental salary statutes. This is confirmed by R.S. 33:2004(D) which provides that a fireman’s supplemental salary shall be included in the calculations and computation of total wages paid to the fireman in the determination of all employee benefits. The right to receive premium pay for overtime work is certainly a benefit to an employee. It is something which, if not required by law, would be subject to bargaining between him and his employer. We are unconvinced by appellant’s argument that premium overtime wages are not an “employee benefit” as contemplated by R.S. 33:2004(D). See Williams v. City of West Monroe, 403 So.2d 842 (La.App. 2d Cir.1981). Furthermore, if an employer could circumvent the overtime requirement simply by labeling compensation as extra or supplemental pay, the public policy underlying the legislation would be defeated. Our courts have consistently held in a variety of contexts that state supplements are to be considered as part of the overall level of compensation due to employees. See e.g., Hebbler v. New Orleans Fire Department, 310 So.2d 113 (La.1975) (State supplements are part of “salaries and wages” in R.S. 49:113 requiring that salary must be restored by city for period of illegal separation from service); Latino v. City of Bogalusa, 295 So.2d 560 (La.App. 1st Cir.1974) (state supplement must be included in calculation of overtime wages under R.S. 33:2213); Maes v. City of New Orleans, 97 So.2d 856 (La.App.Orl.1957) (state supplement is part of “salary” subject to pension deduction under R.S. 33:2218.1 et seq.).
422 So.2d at 413 (emphasis added.) Thus, we find that supplemental pay is included in a firefighter’s base pay for the computation of longevity pay raises.
We next address the issue of whether millage funds dedicated to firefighter pay increases should be included in the definition of “base pay” for the purposes of *226 calculating annual increases required by La. R.S. 33:1992(B).
Article XIV, § 25 of the Constitution of 1921 provided as follows:
New Orleans; special tax for fire and police departments:
Section 25. In addition to such other taxes as the City of New Orleans is now, or may be hereafter, authorized to levy, said City shall levy annually a special tax, not exceeding three mills on the dollar, on all taxable property in said City, as assessed and valued for city taxation purposes. The avails of said special tax are hereby dedicated to the maintenance of a double platoon system in the Fire Department and a triple platoon system in the Police Department of said City, and for an increase in the pay of the officers and men in said departments, respectively, and shall be used by said City exclusively for said purposes, respectively, according to such apportionment as said City may make from time to time; provided, however, that one-half the avails of said tax in excess of two mills shall be used exclusively for the purpose of an increase in the pay of officers and men in the Fire Department of said City, while the other half shall be used exclusively for the purpose of an increase in the pay of officers and men in the Police Department of said City.
By virtue of Art. XIV, § 16(A)(10) of the 1974 Constitution, this provision continues in effect as a statute.
Based on the trial court’s reasons for judgment, the only millage issue litigated by the parties in this case, and decided by the court, was whether millage supplements could offset the 2% longevity increases, both in calculating back pay awards and prospectively. However, that millage payments should not be considered as part of base pay was never litigated in the court below. Therefore, the issue is technically not properly before us.
In any event, we find, based on the testimony at trial, that because both supplemental pay and millage payments are included as part of the portion of base pay upon which the overtime rate is calculated, the trial court did not err and is not manifestly erroneous in its finding on this issue. That is, since the City used millage payments in its calculation of overtime payments, the City has effectively conceded that millage is properly included in base pay.
V.
The City next assignment of error concerns an interpretation of La. R.S. 33:1992(B), which states in pertinent part:
From and after the first day of August, 1962, each member of the fire department who has had three years continuous service shall receive an increase in salary of two percent and shall thereafter receive an increase in salary of two percent for each year of additional service up to and including twenty years. [Emphasis added.]
The City argued below that the statute did not require longevity raises beyond twenty years of total service, while the Firefighters contend that the trial court correctly ruled that longevity increases continue through the twenty-third year of a firefighter’s service. The trial court relied on the case of Rushing v. City of Baton Rouge, 96-1601 (La.App. 1 Cir. 6/20/97), 696 So.2d 648, writ denied, 97-1945 (La.11/7/97), 703 So.2d 1271, the only reported decision in the state on the issue.
In Rushing, the issue raised on appeal was whether the longevity benefits provided to firefighters pursuant to La. R.S. 33:1992(B) extend for a seventeen-year pe *227 riod or a twenty-year period. The trial court determined that those benefits continued for a twenty-year period and the City appealed. The court of appeal set forth the problem as follows:
On appeal the City asserts that the legislature did not specifically mention that longevity pay begins on the fourth year of service; however, logic mandates that, because longevity increases begin after three years of continuous service, payment would commence at the start of the fourth year. Similarly, the legislature did not specifically state that longevity increases cease at the end of the twentieth year of service; however, this, too, is a simple and logical inference.
The appellants also assert that the structure of the paragraph provides that the longevity pay will cease at twenty years of service. They assert that if the use of the phrase “up to and including twenty years” is “clearly meant to modify and explain the number of additional years” as suggested by the appellees, then surely the legislature would have the word “additional” modify twenty years instead of “years of service.” They claim that since the word “additional” does not modify twenty years but rather “each year of service” it is erroneous to interpret it to mean twenty additional years.
The appellees contend that LSA-R.S. 33:1992B mandates that the City pay the two percent longevity increase for a total of twenty years after the employee first becomes eligible for longevity pay beginning in the fourth year of service. They assert that the statute needs little interpretation because it is clear that the language “for each year of additional service up to and including twenty years” plainly means that a firefighter who has three years of continuous service becomes eligible to receive a total of twenty years of longevity increases. They contend further that any other construction of the statute ignores the plain use of the word “additional” and that the use of the phrase “up to and including twenty years” is clearly meant to modify the number of addition [sic] years after the firefighters first three years of continuous service.
Id. at pp. 3-4, 696 So.2d at 649.
We agree with the First Circuit that La. R.S. 33:1992(B) is ambiguous and recognize that a credible argument can be made on both sides of the issue. Where a statute is susceptible of two constructions, courts will give that construction which best comports with principles of reason, justice, and convenience, for it is to be presumed that the Legislature intentionally employed language that would avoid leading to injustice, oppression, or absurd consequences. Progressive Sec. Ins. Co. v. Foster, 97-2985 (La.4/23/98), 711 So.2d 675. See also La. C.C. art. 9.
A paramount consideration in interpreting a statute is ascertaining the legislature’s intent and the reasons that prompted the legislature to enact the law. Theriot v. Midland Risk Ins. Co., 95-2895 (La.5/20/97), 694 So.2d 184. One particularly helpful guide in ascertaining the intent of the legislature is the history of the statute in question and related legislation. Id. Where there is any doubt about the intent or meaning of a law in derogation of long-accepted rules, the statute is given the effect that makes the most change in the existing body of the law. Touchard v. Williams, 617 So.2d 885 (La.1993). Finally, our interpretation of the meaning of a statute should be guided by the jurisprudential rule that we not impute a meaning that would lead to an absurd result. Id.
The purpose of La. R.S. 33:1992 and other state statutes governing the pay *228 of firefighters is to provide uniform standards for the minimum wages and working conditions of firefighters. Firefighters I, 422 So.2d at 406.
The record of the convention proceedings [of 1973] indicates that the legislature’s power to set minimum wage and labor standards prevailed because of the obviously compelling state interest in providing citizens with more effective police and fire protection. In expressing variants of this theme, several delegates deplored the failure of local governing authorities to give these needs a higher priority than other community programs, while others called attention to the risks of disparate levels of local fire and police protection resulting from lack of general legislative oversight of minimum standards. However, the driving force in retaining the legislative prerogative was a widely perceived need for state government to address vigorously the problems of rising crime, riots and other public disorders which had become prevalent in the 1960’s and early 1970’s.
Id. at 408-09.
We agree with the trial court and the First Circuit in their interpretation of La. R.S. 33:1992(B). As stated by the First Circuit, “we are convinced that the legislature intended to provide firefighters with liberal benefits.” Rushing, 96-1601 at p. 5, 696 So.2d at 650. The statute begins with a reference to “years of service,” requiring longevity raises for firefighters who have at least “three years continuous service” and for each year of “additional service up to and including twenty years.” We construe this to mean twenty years of additional service after the initial three years. Consequently, we find no merit to this assignment of error.
VI.
The City’s next assignment of error concerns that portion of the trial court’s 28 February 2003 judgment, which reads as follows:
(g) That the City and its officers immediately adjust the base pay of Class members (active and retired) to include all longevity raises that they should receive pursuant to R.S. 33:1992(33), including those accrued outside the July 14, 1978, prescriptive period commencement date, as ordered in the September 4, 2002 Judgment, for purposes of current and future pay, as well as for the calculation of back pay due under this Judgment.
The City argues that this ruling violates La. C.C. art. 3494, which provides that an action to recover wages is subject to a three-year prescriptive period. In response, the Firefighters contend that the trial court correctly held that a firefighter’s base pay must be retroactively adjusted upward to account for the preceding years of longevity raises regardless of when the prescriptive period runs.
In this regard, we affirm the trial court. Although we have previously held that the Firefighters cannot receive back pay until 1990, their back pay for all previous years of service must be calculated to account for the longevity raises they did not receive pursuant to La. R.S. 33:1992(13), subject to credits in favor of the City. This rationale is supported by both New Orleans Firefighters Ass’n v. City of New Orleans, 286 So.2d 674 (La.App. 4 Cir.1973), writ denied, 289 So.2d 161 (La.1974), and Turner v. City of Shreveport, supra. While prescription limits the date from which the Firefighters can begin to receive back pay, it does not eliminate their statutory right to credit for years served.
*229 VII.
Before we address the City’s remaining assignments of error, we will consider those of the Commission as they all deal with back pay calculations. We have already addressed the Commission’s first assignment of error in assigned error one of the City. Further, the Commission’s assigned errors three and four were addressed in globo in assigned error four of the City. Therefore, the only error left for our consideration is whether the trial court erred in the manner in which it calculated back pay.
The Commission maintains that the trial court erred as a matter of law by using a year-by-year calculation rather than to subtract the total amount of wage increases received from the total amount that is due. In support of its argument, the Commission relies on the case of Martin v. Bonanno, 421 So.2d 359 (La.App. 1 Cir.1982). However, we find this case to be inapposite to the facts of the case at bar.
In Martin, an illegally discharged police officer filed suit against the City of Baton Rouge and its police chief for back pay wages of $55,450.50 for the time during which the officer was separated from the force. The defendants answered the suit alleging that the failure to pay back wages stemmed from the officer’s failure to provide his outside earnings during the period of separation. The trial court entered judgment in favor of the plaintiff, but ordered that what he earned while separated from the force be setoff from his back wages. The officer appealed.
The First Circuit held that the basis for the setoff was found in La. R.S. 49:113, which required that a setoff be taken from the salaries and wages withheld during the period of illegal separation.[8] In addition, because the statute said that “all salaries and wages withheld” should be reimbursed and “all wages and salaries earned” should be used as a setoff, the language mandated that the total wages accrued during the entire period be reduced by the total wages. Id. at 362.
That is not the situation presented in this case. The Firefighters were entitled under the law to a 2% longevity raise every year after the third year of service. That longevity raise is then used to calculate the longevity raise for the following year and each year thereafter until the twenty-third year of service. We find that the trial court was not manifestly erroneous in its holding. Consequently, this assignment of error is without merit.
VIII.
The City’s next two assignments of error concern La. R.S. 33:1996, the Firefighters’ annual vacation statute. The statute provides in pertinent part:
Firemen ... after having served one year, shall be entitled to an annual vacation of eighteen days with full pay. This vacation period shall be increased one day for each year of service over ten years, up to a maximum vacation period of thirty days, all of which shall be with full pay.
In Firefighters II, the Supreme Court held that Commission Rule VIII, § 1.2[9] *230 does not violate the terms or the intent of the statute.
La. Rev. Stat 33:1996 requires that firemen covered by the Act be given “annual vacation” days “with full pay,” up to a specified maximum number of days, and prohibits the forfeiture of “vacation privileges ... for any cause.” The term “vacation privileges,” referring to the statutory guarantee which cannot be forfeited, means that a fireman cannot be denied the right to earn and to use the statutory amount of vacation days earned each year. Moreover, a fireman who is separated from employment in a given year must be paid for the vacation benefits he or she has earned as compensation for services already rendered, even if the fireman was discharged for the most serious cause imaginable. See Beard v. Summit Institute, 97-1784 (La.3/4/98), 707 So.2d 1233 (an employer cannot require an employee to forfeit earned wages simply by enacting a policy to that effect).
Commission Rule VIII, § 1.2 does not violate the terms or the intent of the statute. The statutory guarantee is that firemen be allowed to earn and to use a minimum number of vacation days each year. The Rule, while allowing earned vacation days to be carried forward to a succeeding year, simply places a reasonable limitation on the period of time within which earned vacation days must be used. The Rule thus denies a fireman the right to earn vacation days in one year at one salary and then to demand payment for those vacation days fifteen years later at a higher salary, but the Rule does not require forfeiture of earned vacation days which the fireman has been given a reasonable opportunity to use. A ceiling on the number of vacation days a fireman may carry forward is not, in itself, a forfeiture of earned vacation days, unless the fireman was denied the opportunity to use those earned vacation days.
Moreover, the Rule does not violate this court’s 1982 decision in New Orleans Firefighters, supra, [Firefighters I] which held that enforcement of the statute providing for supplemental salary for firemen in combination with their minimum wages did not conflict with the Civil Service Commission’s constitutional rulemaking authority. Nor does the Rule create a labor condition for firemen that is “injurious to the safety and welfare of the public as well as detriment to the health, efficiency and morale of the firefighters,” which was a significant concern of the 1982 decision. Id. at 412. Indeed, the stockpiling of vacation days not only is a right on which the terms of the statute are silent, but also runs counter to the rest, renewal and recreation purpose of vacation days as an employment practice.
We conclude that La.Rev.Stat. 33:1996 does not either grant or deny firemen the right to carry forward earned vacation days to future years. The statute simply is silent on the issue and therefore is not in conflict, on its face, with Commission Rule VIII, § 1.2.
Nevertheless, the City arguably cannot require work conditions or undermanned schedules for firemen that pre *231 vent them from using their accrued leavé each year, as such conduct by the City could constitute an impermissible forfeiture of vacation privileges. Since the matter is presently before us on a summary judgment that we are reversing in part, this issue can be addressed at the trial on the merits.
Id. at pp. 7-8, 788 So.2d at 1170-71 [footnote omitted],
After remand, the Firefighters and the City conducted mini-trials to determine whether certain firefighters were denied annual leave. In its reasons for judgment, the trial court stated:
After a sufficient amount of live testimony, it became apparent to all parties that there were two issues regarding the firefighters’ denial of leave, which encompassed the entire group of seventy plus firefighters who were claiming they were denied leave. Those two groups fell under either: (1) firefighters who were denied leave because they were out on “on-the-duty” injuries (“ODI”); and (2) firefighters who were not able to use their leave because of either manpower shortages or minimum manning requirements.[10]
The trial court analyzed the issue by focusing on one group at a time. With regard to the firefighters denied leave due to on-the-duty injury, the court held that any firefighter who was denied leave due to being out of work on an on-the-duty injury was “denied” those days in accordance with the Supreme Court’s mandate and was entitled to receive compensation. The court also held that those firefighters who lost the ability to use vacation days due to manpower shortages and/or minimum manning requirements were also inappropriately “denied” leave and should also receive compensation.
The City argues that the trial court erred in holding that it violated this statute by denying firefighters a reasonable opportunity to use their annual leave. With regard to the on-the-duty injury group, the City contends that these were not illegal denials of La. R.S. 33:1996 vacation privileges because a firefighter who is already off work and receiving workers’ compensation benefits has not suffered any loss compensable under the statute. On the other hand, the Firefighters contend departmental policy prohibited the use of annual leave while on sick leave and that the trial court was correct in its ruling.
There were also denials of “casual annual leave” [11] due to manpower shortages or minimum staffing requirements. The City contends that the system provides all firefighters with a reasonable opportunity to use their earned vacation days during the years, although not always at the time of one’s choosing. However, a firefighter who elects not to request all of his/her leave a year in advance and hopes to take casual leave at a later date, takes that risk that those days will not be available. The City contends that the system is fair and does not violate the statute or the pronouncements of the Supreme Court in Firefighters II.
The Firefighters argue that the testimony and documents entered into evidence were uncontradicted by the City and demonstrate an illegal forfeiture. Thus, they argue that the trial court’s findings are not clearly wrong or manifestly erroneous.
Before addressing the loss of annual leave, we set forth the statutes, Civil Ser *232 vice rules, and portions of Collective Bargaining Agreements between the City and the Firefighters that apply to the issue of annual leave.
In addition to La. R.S. 33:1996, quoted earlier in this opinion, La. R.S. 33:1995 and La. R.S. 33:1995.1 address sick leave. They state as follows:
§ 1995. Sick leave
Every fireman in the employ of a municipality, parish or fire protection district to which this Sub-part applies, shall be entitled to full pay during sickness or incapacity not brought about by his own negligence or culpable indiscretion for a period of not less than fifty-two weeks.
§ 1995.1. Sick pay reduced by worker’s [sic] compensation
A fireman employed by any municipality, parish or fire protection district who draws full pay during sickness or incapacity shall have such pay decreased by the amount of worker’s compensation benefits actually received by the employee.
Commission Rule VIII, § 1.2, with regard to annual leave, provides:
On December 31 of each year the accumulated annual leave of all employees hired before January 1, 1979 shall be carried forward to the succeeding year, provided that accumulated annual leave carried forward shall not exceed ninety (90) leave days.
On December 31 of each year the accumulated annual leave of all employees hired after December 31, 1978 shall be carried forward to the succeeding year, provided that accumulated annual leave carried forward shall not exceed forty-five (45) leave days.
Commission Rule VIII, § 1.5 provides:
Accumulated annual leave may be taken at the time or times requested by the employee and approved by the appointing authority. If the work load of the employee’s organizational unit makes the granting of annual leave undesirable for the time requested, the appointing authority shall notify the employee.
Each employee shall be entitled to use a minimum of one year’s accumulation of annual leave during any calendar year. When an employee entitled to annual leave makes a written request for leave, the appointing authority shall, within five (5) days after the date of the employee’s request, either approve or disapprove the request in writing. If the request is denied, the appointing authority shall grant, in writing, permission for use of the annual leave requested during an equivalent period within the six-month period following the employee’s request. This written permission shall be given to the employee within ten (10) working days after the request.
Finally, the City and the Firefighters have entered into several collective bargaining agreements over the years. The City has filed into evidence five separate agreements effective from 3 March 1979 through 18 May 2005.[12] Until the last collective bargaining agreement, the language regarding vacations is substantially similar and states as follow:
The scheduling of annual vacations shall be determined by the seniority of each employee of equal rank within each platoon of each Fire District. Fire Lieutenants and Fire Captains shall be in the first group and shall have their seniority determined from their date of entry into the Department.
Fire Fighter and Fire Apparatus Operators shall be in the second group and *233 shall have their seniority determined from their date of entry into the Department.
Members from the Division of Fire Alarm and Fire Prevention shall have their seniority determined from their date of employment.
In the event that two or more members were employed on the same date, their rank on the respective employment list will determine their seniority. The Superintendent reserves the right to reassign individual vacations if requested by a member.
Swapping of vacation periods among the men of the same platoon is hereby prohibited by this agreement unless the exchange of the vacation period is for good cause and approved by a two-thirds (2/3) majority of all of the men on the vacation list involved.
The first group (officers) shall choose their vacation first, choosing either a full vacation or a partial vacation. The second group shall then choose their vacations in the same manner. Then the first and second groups shall repeat the same procedure. Members may at their option choose to waive both their picks and after the second group completes all selections, any member may then choose from the remaining vacations.
If any vacation period previously selected by a member of either group becomes available due to the death of the member, retirement or transfer of the member prior to his using the said vacation period, then said vacation period shall be available to the men of the same group on the same seniority basis.
* * *
The total each platoon can have on vacation at any given time is 29 men.
In 1984, the paragraph was amended to read:
THE TOTAL EACH PLATOON CAN HAVE ON VACATION AT ANY GIVEN TIME IS 32 MEN NOTWITHSTANDING ANY OF THE PROVISIONS OF THE ARTICLE ON PRIORITY LEAVE. [Emphasis in original.]
In 1988, the paragraph above was amended as follows:
No more than ten percent (10%) of a platoon’s strength shall be allowed on annual leave at any given time. An additional two (2) individuals shall be allowed on casual annual leave.
This final paragraph was again amended in 1991 as follows:
No more than ten percent (10%) of a district’s strength shall be allowed on annual leave at any given time. The district’s strength figure shall not include chief officers. An additional two (2) individuals shall be allowed on casual annual leave.
The following change was made in 1995:
No more than nine percent (9%) of a platoon’s assigned strength shall be allowed on annual leave at any given time. The platoon’s strength figure shall not include chief officers. An additional two (2) individuals shall be allowed on casual annual leave.
Finally, in 2001, the section on annual leave was entirely rewritten:
Each employee is eligible to take his accumulated annual leave either in the form of “vacations” or as “Casual Annual Leave.” As detailed below, vacations shall be selected on an annual basis and shall be comprised of at least 4 tours in length. Casual leave may be requested no more than 96 days preceding the date requested. If there are more requests filed for casual annual leave than available under the below described limits, *234 then those members who have requested the day as casual annual leave 90 or more days before the requested leave day shall be granted the available leave days based on seniority among the employees whose request for leave is received on or before 12 noon on the 90th day before day [sic] for which leave is requested. Requests received after that time shall be placed in order below the list established on the 90th day based on the date of receipt. If more than one request is received on the same day then they shall be placed on the request list in seniority order. The scheduling of annual vacations shall be determined by the seniority of each employee of equal rank within each platoon of each Fire District. Fire Captains shall be in the first group and shall have their seniority determined from their date of entry into the Department.
* * *
After vacations are selected, employees may, at their option choose to waive all or a portion of a vacation. Such waiver must be executed by notifying the Superintendent’s office at least 10 tours before the commencement of the scheduled vacation.
* * *
No more than nine percent (9%) of a platoon’s assigned strength shall be allowed on vacation leave at any given time. The Superintendent has the authority to cancel any or all casual leave days in emergencies or for extraordinary operational needs of the Department. The platoon’s strength figure shall not include chief officers. An additional two (2) individuals (above the nine percent (9%)) shall be allowed on casual annual leave. More casual leaves may be allowed as long as those leaves do not exceed nine percent (9%) plus the two mentioned above.
Beginning in the 1988 bargaining agreement, the section on priority annual leave has included:
3. Cases where a member is threatened with the forfeiture of annual leave if not utilized by a certain date, provided that such member utilizes a half vacation period during that year.
All but the 1979 collective bargaining agreement discuss the issue of sick leave. For purposes of this opinion, only the following paragraph, as contained in the remaining four agreements entered into evidence, is pertinent:
5. Sick leave as provided in LSA-R. S. 33:1995 will be used prior to the accumulated sick leave as provided by the Civil Service Rules and Regulations when an employee receives an on-duty injury and is entitled to Worker’s [sic] Compensation.
We will first address the issue of lost annual and/or casual leave due to on-the-duty injury. The trial court found that any firefighter who was denied annual leave due to being out of work on an on-the-duty injury was “denied” those days in accordance with the Supreme Court’s mandate and is entitled to receive those days.[13]
The system of annual leave (or vacation) and casual annual leave was described in the testimony heard by the Special Master appointed by the trial court. Walter Du-peire, management services administrator, stated:
A vacation is one that is planned in advance and picked through the seniority process that I just described. Casual *235 annual leave is if a firefighter, for some reason, needs to take a single day, a single tour or a single day of annual leave, a special request would be made to take that. And that request would typically be granted if manpower were sufficient that we need not hire overtime to replace that individual. If manpower were so short in supply that allowing someone off on casual annual leave would cause the Fire Department to hire overtime, then that firefighter would have an opportunity to reschedule that request for annual leave.
Mr. Dupeire stated that all personnel schedule vacations at the beginning of the year. He also testified that every firefighter could schedule enough vacation time in the beginning of the year so that he/she would be able to exhaust all of his/her annual leave allotment for that year. The only reason that might not happen was explained by Mr. Dupeire:
The situation might exist whereby an individual is on an extended sick leave perhaps for some sort of injury, either on-duty or off-duty, and since they are on this sick leave they are not having the opportunity to take annual leave. And in such a case it is possible that a person’s accrued leave would exceed the cap and, therefore, could be lost at the end of the year.
However, assuming that one was not out on an on-the-duty injury during a scheduled vacation, a firefighter could schedule enough vacations at the beginning of the year to exhaust all vacation days during that year. Fritz C. Conrad, who was interim superintendent at the time of the mini-trials in late January 2003, confirmed Mr. Dupeire’s testimony. Mr. Conrad testified that casual annual days were not guaranteed, but that vacation picks were guaranteed to cover the amount of days a firefighter accumulated in annual leave.
Nicholas Felton, President of Firefighters Local Union 632, explained the minimum manning provisions of the collective bargaining agreements:
It has always been the position of our organization [the union] that the minimum staffing requirements, the minimum personnel requirements, would strictly govern by our concerns for safety. And you know, we would hope— we’ve always bargained with the attitude to try to come in close compliance with the National Fire Protection Association or NFPA standards.
It was undisputed that a firefighter out on an on-the-duty injury and receiving full pay could neither take scheduled annual vacation that was selected in the beginning of the year nor take days of casual annual leave at the same time. Thus, a firefighter who is scheduled to take annual vacation in November or December and is injured during those months would not have an opportunity to reschedule those days and would be forced to forfeit those days that exceed the cap.
In its reasons for judgment, the trial court stated:
The City’s position would basically allow a firefighter’s vacation days to be given or taken away from him, depending upon the fortuitous nature of his on-the-job injury. If two firefighters were injured in exactly the same way and missed the exact number of day, the City’s position was that the firefighter hurt later in the year would lose his right to exercise annual leave. There was no testimony or evidence presented that vacation days or the denjal of the ability to use vacation days was based upon the “luck” of being injured earlier in the year as opposed to later in the year.
*236 The City argued at the mini trials that the fortuitous nature of the type and time of an injury was simply “part of the system.” This argument is entirely inconsistent with the Louisiana Supreme Court mandate of Firefighters Local 632 v. New Orleans, 788 So.2d 1166 (La.2001).
We agree with the trial court. When a firefighter is injured on the job and, as such, loses his scheduled annual leave, the firefighter has not been given a reasonable opportunity to use those earned vacation days; in other words, the firefighter is forced to forfeit those days through no fault of his or her own. Consequently, we find that the on-the-duty injury group is entitled to be compensated for those lost days.
We next turn to the firefighters who were denied casual annual leave. The trial court pointed out that there was no testimony that any firefighter was arbitrarily denied leave. The unanimous testimony indicated that if a firefighter were denied leave, it was due to the fact that there was either a manpower shortage or that minimum manpower requirements needed to be met.
We have examined the statutes, collective bargaining agreements, and the Commission Rules, along with the Supreme Court’s opinion in Firefighters II, and the evidence presented at the mini-trials. We find that the City has devised a system by which all firefighters can take their earned annual leave, if the system is followed. This system has the approval of the union and its members. The Firefighters cannot now claim that a system they agreed to is inequitable.
Due to the nature of the service the Firefighters provide to the City, it is understandable that adjustments are necessary at various times of the year. That is the purpose of the carry-over days permitted to the Firefighters. However, those firefighters who waive an annual vacation and opt to request casual days later in the year are knowingly running the risk that their requests could be denied; in light of the persistent manpower shortages in the ranks of the firefighters since 1986, a firefighter should not count on receiving permission for many casual days, especially in the latter part of the year. Although there have been firefighters who have lost vacations days due to manpower shortages or minimum staffing requirements, we do not find that these forfeitures presently violate La. R.S. 33:1996 or the mandate of the Supreme Court in Firefighters II.
The last issue on annual leave is the effective date for entitlement to back pay for forfeited vacation benefits under La. R.S. 33:1996. In a judgment of 4 September 2002, the trial court denied the City’s motion that attempted to limit the Firefighters’ claim for added vacation benefits to the period after 20 November 1991. In its reasons for judgment, the court stated:
Further, the Court finds that the 1991 effective date of the amendment to Art. 6[sic], Section 4 of the 1974 Constitution is inapplicable because the Louisiana Supreme Court declared in 1982 that the entirety of the firemen’s minimum wage law was enforceable in New Orleans. See New Orleans Firefighters Assoc. v. Civil Service Commission, 422 So.2d 402 ([La.] 1982).
The City contends that the trial court misinterpreted Firefighters I, which did not address the issue of vacation benefits or even the application of La. R.S. 33:1996. The City asserts that prior to the 1991 amendment, La. R.S. 33:1996 vacation benefits were not included in La. Const. Art. VI, § 14; therefore, under the general prohibition against laws increasing the financial burdens of a political subdivision, *237 such benefits were not required of the City absent state funding.
The Firefighters respond by arguing that the trial court correctly relied on Firefighters I; as such the 1982 decree is comprehensive and final as to the entirety of the minimum wage law, which includes vacation benefits.
The 1991 amendment to the constitution, effective 21 November 1991, rewrote the existing text, designating it as paragraph A, and added paragraph B. Prior to the amendment, the text read in its entirety:
Section 14. No law requiring increased expenditures for wages, hours, working conditions, pension and retirement benefits, vacation, or sick leave benefits of political subdivision employees, except a law providing for civil service, minimum wages, working conditions, and retirement benefits for firemen and municipal policemen, shall become effective until approved by ordinance enacted by the governing authority of the affected political subdivision or until the legislature appropriates funds for the purpose to the affected political subdivision and only to the extent and amount that such funds are provided. This Section shall not apply to a school board. [Emphasis added.]
Article VI, § 14 now reads in pertinent part:
(A) No law or state executive order, rule, or regulation requiring increased expenditures for any purpose shall become effective within a political subdivision until approved by ordinance enacted, or resolution adopted, by the governing authority of the affected political subdivision or until, and only as long as, the legislature appropriates funds for the purpose to the affected political subdivision and only to the extent and amount that such funds are provided, or until a law provides for a local source of revenue within the political subdivision for the purpose and the affected political subdivision is authorized by ordinance or resolution to levy and collect such revenue and only to the extent and amount of such revenue. This Section shall not apply to a school board.
(B) This Section shall not apply to:
[[Image here]]
(5) A law providing for civil service, minimum wages, hours, working conditions, and pension and retirement benefits, or vacation or sick leave benefits for firemen and municipal policemen. [Emphasis added.]
An initial comparison of the two versions of La. Const. Art. VI, § 14 reveals that the phrase “vacation or sick leave benefits” was added to the constitution in 1991; this was a change specifically made. Thus, it cannot be argued that any decision in 1982 addressed this issue. In addition, Firefighters I addressed the issue of minimum and overtime wages:
We are confronted here with the problem of determining the allocation of constitutional power between the Legislature and the City Civil Service Commission to make rules of law establishing New Orleans firefighters’ minimum and overtime wages. This question, which is one of first impression under the 1974 Louisiana Constitution, arises because of a conflict between state statutes requiring inclusion of firefighters’ supplemental salaries in overtime wage computations and the New Orleans Civil Service Commission’s uniform pay plan, which excludes such salaries from the calculations.
[[Image here]]
Specifically, we are called upon to answer two questions: (1) Does the Legis *238 lature’s plenary power to enact a law providing for “minimum wages” or “working conditions” for firemen yield to the Civil Service Commission’s power to adopt uniform pay scales? (2) Do the statutes setting a minimum wage schedule, overtime rules, and supplemental salaries constitute law providing for “minimum wages” or “working conditions” for firemen?
Id. at 404-06. Thus, the Court never addressed the issue of vacation benefits and any language in Firefighters I that seems to do so is mere dicta and not binding on this court. Therefore, we find that the trial court erred as a matter of law by resolving this issue through its reliance on Firefighters I.
We are, thus, faced with a matter of first impression, and we begin by examining the language of the provision in question. The interpretation of a law involves primarily the search for the legislative intent. Ruiz v. Oniate, 97-2412, p. 4 (La.5/19/98), 713 So.2d 442, 444. However, where the terms of a statute are unambiguous and do not lead to absurd results, the statute should be interpreted according to its terms.
In the case at bar, we find no absurd results by applying the unambiguous terms of La. Const. Art. VI, § 14 as amended in 1991. Prior to this amendment, vacation and sick leave benefits were not included; after the 1991 amendment, they were. Therefore, we reverse the trial court and hold that the calculation of forfeited vacation benefits by the on-the-duty injury group is limited to the period beginning 21 November 1991, the effective date of the amendment. We remand this issue to the trial court for recalculation.
IX.
The City’s final assignment of error concerns whether the trial court erred in refusing to allow the City to amend its answer following remand to assert affirmative defenses of laches and equitable es-toppel. We first address the issue of whether the trial court abused its discretion by denying the City’s motion for leave to amend.
The City’s motion to amend its answer was heard by the trial court on 25 January 2002 and was denied by the court on 28 January 2002. In its reasons for judgment, the trial court identified the issue as whether the City was entitled to amend its answer to assert the defenses of laches and setoff as to the remaining issue of quantum. As noted by the trial court, the City had previously raised the doctrine of laches, which the trial court denied. On appeal of that decision to this court, the City argued that its exception of estoppel by the doctrine of laches should have been sustained as to all or a portion of the Firefighters’ claims. We held:
As to the City’s assertion that the plaintiffs’ claims should be barred by the doctrine of laches, we note that the common law doctrine of laches does not prevail in Louisiana. Picone v. Lyons, 601 So.2d 1375 (La.1992). It is to be applied in “rare and extraordinary cases.” T.D. v. M.M.M., 98-0167 (La.3/2/99), 730 So.2d 873, 876. The purposes of this rarely applied doctrine is to prevent injustice which might occur from the enforcement of long neglected rights and to recognize the difficulty of ascertaining the truth as a result of delay. Barnett v. Develle, 289 So.2d 129 (La.1974). The doctrine “addresses itself to the evidentiary effect of delay.” Id. at 139. This is not the situation we are faced with in the instant case. Related litigation has been ongoing since 1982. Accordingly, the trial court did not err in denying the defendants’ exceptions of prescription and their claims of laches.
*239 New Orleans Firefighters Local 632, AFL-CIO v. City of New Orleans, 99-1995 (La.App. 4 Cir. 6/7/00), 767 So.2d 112, 115-16, reversed on other grounds, 2000-1921 (La.5/25/01), 788 So.2d 1166.
As for the issue of setoffs, the trial court held that the Supreme Court had already ruled on the conflict between the statutes and Commission rules and that no further litigation of the matter would be appropriate. Finally, as for the argument that the union’s ratification of wages and benefits estops the Firefighters from claiming any award of back or front pay from the City, the affidavit of the president of the union stated that the union did not vote on the plan. Even if the union did vote, the trial court recognized that the collective bargaining agreement between the parties states that it does not control matters vested in the exclusive control of the Commission, such as pay plans.
Thus, the trial court held that the City was barred from litigating previously adjudicated matters on remand and that to allow the City to raise issues with questionable validity or relevance would not be in the interest of judicial economy.
We find no abuse of discretion on the part of the trial court in denying the City’s motion to amend. In any event, even if the trial court had abused its discretion, we find, as did the court below, that the defenses asserted in the amended answer were either disposed of earlier in this litigation or of questionable validity or relevance. Thus, this assignment of error is without merit.
X.
We now turn to the two issues raised by the Firefighters in their cross appeal. First, they contend that the trial court abused its discretion by failing to amend the judgment to include class members who were omitted from the data provided by the City. Second, the Firefighters argue that the trial court erred by retroactively applying 45 and 90-day caps to its award of past due annual leave because they were never given an opportunity to use their annual leave days.
On the first issue, the Firefighters explain that the information contained in Exhibit I, a 42-page alphabetized printout summarizing the calculations of more than 1,500 class members, was taken from an email transmission from the City’s payroll office. After a notice was issued in January or February 2003, approximately fifteen class members realized that they had been omitted from the list. These were class members employed after 1979 in the Fire Suppression Division of the Department who had resigned and were transferred to the Fire Alarm or Fire Prevention Division; they were either not listed at all or listed showing their Fire Alarm or Fire Prevention service, not their Fire Suppression Division service.
The Firefighters filed a motion for limited new trial for the purpose of adding the missing class members, which was denied by the trial court. The City contends that the trial court was correct because it was the Firefighters who compiled the list and the calculations.
We find that the information used to compile the list for calculation purposes was provided to the Firefighters by the City. We also find the number of excluded Firefighters to be negligible. At this point, all that needs to be done is a mathematical calculation. As we are remanding this case for recalculations for other class members, no hardship is imposed upon the parties by permitting the limited new trial. Therefore, we reverse the trial court, and grant the motion for new trial for the sole purpose of adding the fifteen firefighters who were omitted. Calculations for these *240 class members will be performed upon remand.
XI.
The last assignment of error concerns the trial court’s decision to limit the firefighters’ payment for prior accrued leave benefits to the 45/90-day cap provided by Commission Rule VIII, § 1.2. The Firefighters contend that this ruling deprives them of all the lost vacation time they never had the opportunity to take. In response, the City argues that the Supreme Court not only ruled that the “use or lose it” rule does not conflict with the state statute, but also specifically rejected the “stockpiling of vacation days.”
We have already determined that only the on-the-duty injury group is entitled to recover the vacation days lost due to on the job injuries. As we have rejected the claims of those firefighters who lost casual annual leave due to manpower or minimum staffing requirements, this issue is moot. However, as for the on-the-duty injury group, we find no error on the part of the trial court’s ruling in limiting their recovery to the 45/90-day cap. Thus, this assignment of error is without merit.
Based on the foregoing, we amend in part, affirm in part, and reverse in part the trial court’s judgment, and remand to the trial court for recalculation of damages.

AMENDED IN PART; AFFIRMED IN PART; REVERSED IN PART; REMANDED.

. La. C.C. art. 3494 provides a three-year prescriptive period for the following:
An action for the recovery of compensation for services rendered, including payment of salaries, wages, commissions, tuition fees, professional fees, fees and emoluments of public officials, freight, passage, money, lodging, and board.
Because the trial court found that the 1993 amended petition for longevity pay "related back” to the filing of the original petition in 1981, it held that benefits would begin to accrue in 1978, three years before the original petition was filed.

. When the Supreme Court granted the City's writ, it stated as follows:
Granted consolidated with 2000-C-1921. Briefing and argument shall not address revisiting this Court’s decision in New Orleans Firefighter’s[Firefighters] Association v. Civil Service Commission, 422 So.2d 402 (La.1982). [Emphasis added.]

. Nevertheless, the Court held that the City could not require work conditions or undermanned schedules for firemen that prevent them from using their accrued leave each year, as such conduct by the City could constitute an impermissible forfeiture of vacation privileges. Since the matter was before the Court on a summary judgment, it reversed in part so that the issue could be addressed further at the trial on the merits. 2000-1921 at pp. 7-8, 788 So.2d at 1171.

. "Police power" of the state is generally described as the state's "inherent power to govern persons and things, within constitutional limits, for promotion of general health, safety, welfare, and morals." City of New Orleans v. Board of Directors of Louisiana State Museum, 98-1170, p. 11 (La.3/2/99), 739 So.2d 748, 757.

. La. Const. art. VI, § 9(B) provides that the police power of the state shall never be abridged.

. See supra at n. 1.

. Civil Service Commission Rule IV, § 8.1 granted 2.5% longevity increases to each class member after completing the first, fifth, fifteenth, and twentieth year of service.

. La. R.S. 49:113 provides:
Employees in the state or city civil service, who have been illegally discharged from their employment, as found by the appellate courts, shall be entitled to be paid by the employing agency all salaries and wages withheld during the period of illegal separation, against which, amount shall be credited and set-off all wages and salaries earned by the employee in private employment in the period of separation.

. Commission Rule VIII, § 1.2 provides:
*230 On December 31 of each year the accumulated annual leave of all employees hired before January 1, 1979 shall be carried forward to the succeeding year, provided that accumulated annual leave carried forward shall not exceed ninety (90) leave days.
On December 31 of each year the accumulated annual leave of all employees hired after December 31, 1978 shall be carried forward to the succeeding year, provided that accumulated annual leave carried forward shall not exceed forty-five (45) leave days.

. As recognized by the trial court, there was no testimony that any firefighter was arbitrarily denied leave.

. “Causal annual leave” are random vacation days that are not requested as a part of a firefighter’s annual leave.

. This last agreement was entered into on 18 May 2001 and is effective until 18 May 2005.

. In Firefighters II, the Court held that firefighters could not be denied the opportunity to use their earned vacation days. 2000-1921 at p. 7, 788 So.2d at 1170.